Scottie Ballard appeals from a summary judgment entered in favor of Alan Godfrey Lee in Ballard's action against Lee and others seeking compensation for alleged insurance fraud.
In late August 1990, Scottie Ballard visited the office of the Sealy Insurance Agency ("Sealy") in Hamilton, Alabama, seeking property coverage on a restaurant that he had recently purchased. During that visit, Ballard and Sealy employees discussed the description and the value of the property and the consequent amount of coverage. Ballard requested coverage for the structure in the amount of $85,000 and coverage for its contents in the amount of $45,000, according to his estimations of their respective values. Sealy told him that it would begin searching for a company that would supply the requested coverage and that Sealy would notify him within a few days.
Sealy's initial attempts to locate an authorized insurance agency[1] that would supply the coverage were unsuccessful. Consequently, officials at Sealy contacted North Alabama Insurance, Inc. (hereinafter "NAI"), a "surplus lines insurance broker, to assist in the search."[2] Brief of Appellee, at 7. NAI contacted Frizzell International, Limited (hereinafter "Frizzell"), a London brokerage firm, which, in turn, solicited coverage from a number of independent "underwriting syndicates" doing business at Lloyd's, London. A "certain" syndicate (the "Syndicate") agreed to issue a policy after the receipt of an inspection report, an executed application form, and the installation of a specified fire protection system.
Frizzell notified NAI of the Syndicate's terms, and NAI informed Sealy. Subsequently, Sealy employee Travis Ray Carter relayed the information to Ballard, saying: "I have got your insurance and got you bound, if you want it. . . . It's $85,000 and $45,000." Ballard assented to these conditions *Page 1370 
and paid the premium to Sealy, which subsequently forwarded the appropriate amount to the Syndicate.
On August 22, 1990, notice of Ballard's acceptance was relayed to NAI by Carter, who telephoned Alan Mitchell, an employee of NAI. Because Carter was unable to speak personally to Mitchell, he left a message, stating: "Bind." The same day, Mitchell sent the following facsimile message: "PLS. BIND PER YOUR QUOTE EFFECTIVE 8/22/90 @ 2:45 PM." The following day, Mitchell contacted Frizzell again by facsimile, asking: "WERE YOU ABLE TO GET BOUND EFF 8/22 PER MY FAX OF SAME DATE?" To that request, Frizzell immediately responded with a facsimile message to NAI, stating, in pertinent part: "Confirm Bound 100% Lloyds Effective 22nd Aug 90."
On August 24, 1990, NAI ordered a local engineering from to inspect the property. The inspector viewed Ballard's property on August 30, 1990, and reported his findings and recommendations to NAI, which then forwarded the report to the Syndicate. That inspection, however, was accomplished after the restaurant had closed for the day. Consequently, Mitchell ordered that a second inspection be performed during business hours. On October 2, 1990, Frizzell asked Mitchell to confirm (1) that the restaurant was "fully operational," (2) that the fire protection system had been installed, (3) that the inspector's recommendations had been implemented, and (4) that a "reinspection report" would "be forthcoming within [the] next 30 days." On October 16, 1990, Mitchell sent a facsimile message to Frizzell, confirming the implementation of Frizzell's conditions.
On October 19, 1990, the Syndicate issued a policy containing the following pertinent provisions:
"INSURING CLAUSE
 "Subject to the terms, conditions and exclusions hereinafter contained, this policy insures all real and/or personal property (including improvements and betterments) of the Assured or property held by the Assured in trust or on commission or on consignment for which the Assured may be held legally liable against ALL RISKS OF DIRECT PHYSICAL LOSS OR DAMAGE occurring during the period of this Policy as stated in the Schedule attaching to and forming part hereof, hereinafter referred to as the 'Schedule'.
". . . .
"CONDITIONS
"1. VALUATION
 "In case of loss of or damage to property insured hereunder, the basis of adjustment shall be as follows:
". . . .
"REPLACEMENT COST ENDORSEMENT
". . . .
 "It is understood that in the event of loss or damage settlement shall be based upon the cost of repairing, replacing or reinstating (whichever is the least) with material of like kind and quality without deduction for depreciation, subject to the following provisions:
 "(a) The repairs, replacement or reinstatement (all hereinafter referred to as 'replacement') must be executed with due diligence and dispatch;
 "(b) Until replacement has been effected the amount of liability under this policy in respect of loss shall be limited to the actual cash value at the time of loss;
". . . .
 "The Underwriter liability for loss under this policy including this endorsement shall not exceed the smallest of the following amounts:
 "i. the amount of the Policy applicable to the destroyed or damaged property, *Page 1371 
 "ii. the replacement cost of the property or any part thereof identical with such property and intended for the same occupancy and use,
 "iii. the amount actually and necessarily expended in replacing said property or any part thereof."
(Emphasis added.)
On December 28, 1990, Ballard's restaurant was entirely destroyed by fire. Subsequently, estimates of the cost to replace the property were submitted, and GAB Business Services, Inc. (hereinafter "GAB"), was engaged to adjust the claim. Based on the lowest cost estimate, GAB calculated the "actual cash value" of the building to be $52,870 and the "actual cash value" of the contents to be $27,475.33. These computations included deductions in the amounts of $32,130 for depreciation of the building and $24,862.51 for depreciation of the contents.
On March 12, 1991, Frizzell issued to Ballard checks in the amounts of $52,870 and $27,475.33 for the loss of the building and the contents, respectively. With these funds, Ballard retired a $65,000 mortgage on the property and paid off other, unrelated debts. Ballard did, however, protest the shortfall of $56,992.51 from the policy limits. The Syndicate defended its method of payment, contending that Ballard's right to recover the face amount of the policy was contingent upon his reconstruction of the building. Ballard's efforts to obtain a loan for reconstruction failed, partly because the Syndicate refused to serve as a surety on any obligation for that purpose. Ballard subsequently used the restaurant location as collateral for a $10,000 loan, the proceeds of which he also spent on nonrestaurant debts. Eventually, Ballard lost the property when he defaulted on his repayment of the $10,000 note and the mortgagee foreclosed.
On February 4, 1992, Ballard sued the Syndicate and NAI. Counts One and Two of his two-count complaint alleged breach of contract and bad faith, respectively. On April 28, 1992, Ballard amended his complaint to add as defendants Sealy, Carter, "and Alan Godfrey Lee, individually and as representative of those certain Underwriters at Lloyd's Signatory To Policy No. 895-NAL01-118-90" (likewise hereinafter referred to as the "Syndicate"). Also, the amended complaint contained a third count, basically alleging that the Syndicate had fraudulently suppressed the "actual cash value" method by which it limited the amount of benefits that Ballard could obtain under the policy.
The same day, the Syndicate moved the trial court to dismiss the counts contained in the original complaint. Ballard did not respond to that motion, and, on February 12, 1993, the trial court granted the Syndicate's motion with prejudice. On March 16, 1993, the Syndicate moved for a summary judgment on count three, as contained in the amended complaint. The parties argued this motion before the trial judge on April 9, 1993. On April 15, 1993, the trial court entered a summary judgment in favor of the Syndicate, and certified the judgment as a final judgment, pursuant to Ala.R.Civ.P. 54(b). From that judgment, Ballard appealed.
Ballard advances two theories as bases for his fraud claim. The first theory is based on allegations that Carter, as anagent of the Syndicate, misrepresented or suppressed material facts. The second theory is based on allegations that thepolicy, itself, fraudulently suppressed material facts.
 I. Agency
Ballard contends that Carter was the agent of the Syndicate, or, at least, that he concurrently represented the Syndicateand Ballard. The Syndicate denies that Carter was an agent of the Syndicate, contending that he was merely a broker representing Ballard in Ballard's search for coverage.
The functions and characteristics of insurance "agents" and "brokers," respectively, are set forth in Ala. Code 1975, §27-7-1(a). That section defines those two terms:
 "(1) Agent. A natural person, partnership or corporation appointed by an insurer *Page 1372 
to solicit and negotiate insurance contracts on its behalf, and if authorized to do so by the insurer, to effectuate, issue and countersign such contracts. An agent may not delegate the countersignature authority by appointing another person as his attorney-in-fact, except, that this provision shall not apply to agents for direct-writing insurers.
 "(2) Broker. A natural person, partnership or corporation who, on behalf of the insured, for compensation as an independent contractor, for commission or fee and not being an agent of the insurer, solicits, negotiates or procures insurance or the renewal or continuance thereof, or in any manner aids therein, for insureds or prospective insureds other than himself or itself. Brokers cannot bind the insurer and all business produced must be countersigned by a resident agent of the insurer accepting the risk."
(Emphasis added.) See, also, J. Appleman, Insurance Law andPractice § 8726, at 338 (1981) ("A broker is . . . one who acts as a middleman between the insured and insurer and . . . solicits insurance from the public under no employment from any special company").
In this case, it is undisputed that Carter and the Syndicate shared no express contractual relationship. Indeed, Ballard concedes that liability cannot be based on the principle ofrespondeat superior. Brief of Appellant, at 56. After assuming the responsibility, at Ballard's request, to locate an insurer, Carter served at all relevant times as a "middleman" for the transactions between the Syndicate and Ballard. Moreover, no reasonable construction of the communications transpiring among the parties supports the proposition that Carter had either actual or apparent authority to bind the Syndicate. Thus, we are compelled to conclude that Carter's role throughout these transactions was that of a broker.
Ordinarily, "an insurance broker represents the insured and is not considered an agent of the insurer." Lampkin v. Kelly,771 S.W.2d 953, 954 (Mo.App. 1989). A broker usually actssolely as the insured's agent and "has a license to 'hunt' for a suitable policy without having any prior representation contract with any particular insurer." M. Pock, Insurance, 45 Mercer L.Rev. 253, 255 n. 15 (1993); see, also, J. Appleman,Insurance Law and Practice § 8727 (1981). Only "special conditions or circumstances in a particular case [will] warrant the inference that a broker is the agent of the insurer."Lampkin, 771 S.W.2d at 954. These rules are essentially codified in Ala. Code 1975, § 27-7-1(a)(2), which expresses the intent of our legislature with regard to concurrent agency, namely, that in the usual case, a broker will not be regarded as "an agent of the insurer." Id.
We are aware that a broker sometimes performs certain functions that benefit the insurer, such as delivering the insurer's policy to the insured, collecting premiums from the insured, and forwarding the proceeds of the premium to the insurer and, thus, that the broker may, for some purposes, represent the insurer. Hunt v. State, 737 S.W.2d 4
(Tex.App. 1987); see, also, American Fire Ins. Co. v. King Lumber Mfg. Co., 74 Fla. 130, 77 So. 168 (1917), affirmed, 250 U.S. 2,39 S.Ct. 431, 63 L.Ed. 810 (1919). In § 27-7-1(a)(2), however, these activities are expressly, or by clear implication, ascribed to brokers. Thus, the broad application of this rule in Alabama would render anyone who "solicits, negotiates orprocures insurance or the renewal or continuance thereof, or inany manner aids therein, for insureds or prospective insureds," § 27-7-1(a)(2) (emphasis added) — by which activities he qualifies as a broker — ipso facto an agent of the insurer. Such a result would contravene § 27-7-1(a)(2) and would be contrary to the policy of this state as declared by the legislature. Thus, where, in a damages action alleging fraud, a defendant insurer files a properly supported summary judgment motion, suggesting that the person who allegedly defrauded the plaintiff insured was a broker — which the plaintiff contends was a dual agent — the plaintiff's *Page 1373 
rebuttal evidence must relate to activities of the brokerother than those mentioned in § 27-7-1(a)(2).
The only evidence presented indicating Carter's activities, other than his delivering the policy and receiving the premium, related to his assisting Ballard in obtaining a satisfactory inspection report. Because insurance involves an ordinary contractual relationship, the "insurer my impose any terms and conditions consistent with public policy which it may see fit." J. Appleman, Insurance Law and Practice § 7004, at 39 (1981). The Syndicate was entitled to require an inspection report as a condition precedent to its obligation to issue a policy, and Carter's assistance to Ballard in the procurement of a report satisfactory to the Syndicate was merely an "aid" in the procurement of coverage, as provided by § 27-7-1(a)(2). Thus, we conclude that Ballard's evidence indicating that Carter was the Syndicate's agent, on which evidence Ballard sought to base the Syndicate's principal-and-agent liability, was insufficient to defeat the Syndicate's properly supported motion as to the claim of principal-agent liability. Thus, the summary judgment is affirmed as to that claim.
 II. Policy Fraud
Ballard next argues that, through the policy it issued to him, the Syndicate suppressed material facts that it had a duty to disclose, concerning the amount of benefits that the Syndicate would pay in the event of a total loss on the property.
The alleged fraud arises from subparagraph (b) of the "Replacement Cost Endorsement," which states, in pertinent part: "Until replacement has been effected the amount of liability under this policy in respect of loss shall be limited to the actual cash value at the time of loss" (emphasis added). With this provision, the Syndicate limited the benefits Ballard could receive, before the property was replaced, to the actual cash value as it was assessed by the Syndicate's own calculations. The record shows that the definition of "actual cash value" was replacement cost, or $85,000, minus depreciation on the building. Under its own method of calculating the amount of this depreciation, the Syndicate devalued the building by 37.8% and its contents by 55.2% after only four months.
Ballard argues that the Syndicate's insurance policy is fraudulent upon its face, because it does not disclose that the definition of "actual cash value" is the replacement cost less depreciation, and does not disclose the method by which the company would calculate the actual cash value of the property in the event of a total loss.
The Syndicate points out that this Court has consistently upheld the validity and enforceability of replacement policy provisions that allow the insurer to pay only the actual cash value of property, and to withhold full replacement cost, until the replacement is completed to the insurer's specification. See Hilley v. Allstate Insurance Co., 562 So.2d 184 (Ala. 1990) (breach of contract and bad faith claims rejected where replacement cost provisions were found valid and enforceable);Huggins v. Hanover Insurance Co., 423 So.2d 147 (Ala. 1982) (terms of replacement provision upheld as valid condition precedent to receiving full replacement cost); State Farm Fire Cas. Co. v. Ponder, 469 So.2d 1262 (Ala. 1985). Here, however, Ballard does not question the general validity and enforceability of this type of provision in a replacement policy, when the meaning of the provision is known to the insured. Rather, Ballard argues that, under the facts of this case, it was fraudulent for the Syndicate not to inform him, within the written policy, of how the provision would limit the benefits that would be paid to him in the event of a total loss.
To establish a claim of suppression under Ala. Code 1975, § 6-5-102, the plaintiff must establish that there was a suppression of a material fact, which the defendant was under a duty to communicate either because of a confidential relationship or because of the particular circumstances of the case. The question of the existence of a duty to disclose a material fact is for the jury to *Page 1374 
resolve, and in reaching that question the jury should consider the relationship of the parties, the value of the particular fact suppressed, and the relative knowledge of each party.Baker v. Bennett, 603 So.2d 928 (Ala. 1992), cert. denied,507 U.S. 912, 113 S.Ct. 1260, 122 L.Ed.2d 658 (1993).
Ballard does not claim that he had a confidential relationship with the Syndicate, nor do we find one. On the contrary, as a surplus lines insurer, the Syndicate is far removed from an individual insured, and its only link to Ballard within the web of brokers and insurance procurers between them was the written policy itself. The policy states that, until the property is replaced, the Syndicate will pay only the "actual cash value" of the property. The policy does not, however, reveal the meaning of the term "actual cash value."
At the summary judgment hearing, Ballard testified that he interpreted the term "actual cash value" to simply mean the amount of money that the property could reasonably be sold for in the marketplace. Travis Ray Carter, as a 41-year veteran of the insurance business, testified that the everyday interpretation of "actual cash value" would suggest the amount of money that Ballard's property was worth when it burned. William Payne, president of Sealy Insurance Agency, Inc., with 25 years' experience in the insurance industry, testified that the everyday meaning of the term was "fair market value," but he emphasized that the insurance industry defines the term "actual cash value" differently from the way laypeople define it. He also stated that he knew of no way that a policyholder would know that the insurance industry interpreted the term differently, unless it was defined in the policy.
Nelson Gribble, president of North Alabama Insurance, Inc., testified that when an insurance company is assessing the value of a property in order to determine how much it can be insured for, it commissions a valuation report to determine the "actual cash value" based on "fair market value, allowing for depreciation." In utilizing this "everyday" method of computing "actual cash value" before issuing coverage, the Syndicate depreciated the property by only $22,400, or 20%, and assigned it a value of $89,600. After the fire, only four months later, the Syndicate utilized the "industry" method of calculating "actual cash value"; the Syndicate depreciated the property by another $32,130, or 37.8%, deducted this amount from the policy limits and valued the building at $52,870.
James Allen Mitchell, the NAI broker who handled the acquisition of Ballard's policy, testified that in ordinary usage "actual cash value" is a "fairly common-sense term meaning a fairly common-sense thing; it means the value of something, whatever that something happens to be, for cash." He then added that, in insurance jargon, it means "replacement cost minus depreciation." Simon White, a London-based "claims settler" who handles the claims of Lloyd's, London, testified that the term is defined within the industry as "replacement cost, less an allowance for depreciation, wear and tear," and that this definition was "universal" in the settling of insurance claims. White stated that he learned this fact by his experience in the insurance industry. Peter Lenhart, the claims adjuster who calculated the loss on the property, testified that "actual cash value" is an "insurance term" that he learned through "correspondence courses, through education center training, through the . . . Insurance Institute of America, [and] all the classes and knowledge that I received over my career."
The evidence establishes that the sole communication between Ballard and the Syndicate was the written replacement policy. As the Syndicate states in its brief, coverage through the non-standard, surplus lines insurance market is unusual and can be complex, and Alabama law does require that there be surplus lines brokers to act on behalf of the insured. Ala. Code 1975, § 27-10-25; § 27-7-1(a)(2). We nonetheless point out that, where a written policy is the only communication from a remote insurer, the written meaning of the policy's terms takes on a heightened significance to the insured, who must abide by them. *Page 1375 
The evidence shows that the Syndicate employed the term "actual cash value" as a tool of its trade to sharply limit the benefits Ballard could receive after a total loss, without defining the "industry" term within the policy. The evidence also shows that the term "actual cash value" has an accepted everyday meaning, which would be known by a layperson, and that its meaning for purposes of a replacement policy is generally known only to those in the insurance industry. Because Ballard has thus established his suppression claim with substantial evidence concerning the relationship of the parties, the value of the fact suppressed, and the relative knowledge of each party, the claim must be presented to the jury.
We do not today disturb that line of cases wherein we have upheld the validity and enforceability of "actual cash loss" provisions in replacement policies. We again note that replacement of the insured property is a legitimate condition precedent to receiving the full replacement cost. SeeHuggins v. Hanover, supra. We also recognize that foreign insurers who issue surplus lines policies through a system of brokers and underwriters do this for profit. We emphasize, however, that when consumers generate this profit for an insurer whose only link to them is a written policy, they are entitled to read in that policy the basic facts about the coverage they are paying for. This is a particularly compelling point where a material term in the policy is not given its ordinary meaning, but is instead treated as a term of art and its specialized meaning is kept from the insured, who will obtain and pay for coverage in ignorance, then learn the truth in surprise when a loss occurs.
Based on the foregoing, we reverse the summary judgment as to the suppression claim and remand the cause for further proceedings; the summary judgment is affirmed insofar as it relates to the claim based on the theory of agency.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
ALMON, SHORES, and HOUSTON, JJ., concur.
MADDOX and COOK, JJ., concur in part and dissent in part.
HORNSBY, C.J., and INGRAM, J., recused.
[1] An "authorized" insurer is one duly certified by the Alabama Department of Insurance to "transact insurance in this state," Ala. Code 1975, § 27-3-1, upon compliance with the provisions of §§ 27-3-1 to -29.
[2] Ala. Code 1975, §§ 27-10-20 to -38, authorizes the purchase of "surplus lines" coverage, that is, insurance supplied by unauthorized insurers, after "diligent effort has been made" to purchase coverage from authorized insurers. See § 27-10-20.