Carolina Casualty Insurance Company ("CCIC"), an excess and surplus-lines insurance carrier, appeals from a judgment entered by the Russell Circuit Court declaring that Miss Deanna's Child Care — Med Net, L.L.C. ("Med Net"), is entitled to a defense and indemnity from CCIC with respect to a civil action brought against Med Net by Corrinne Wright arising from injuries Wright claimed to have received as a result of the alleged negligent or wanton operation of a motor vehicle by one of Med Net's employees on February 21, 2001, a date that CCIC contends fell during a lapse in Med Net's automobile liability insurance coverage. We reverse and remand.
The record reveals that in 2000 CCIC issued an automobile liability insurance policy to Med Net covering three of Med Net's vans; that policy, numbered CTP 335724, was effective from February 17, 2000, to 12:01 a.m. on February 17, 2001, and will be referred to in this opinion as "the 2000 policy" based upon the year of its original issuance. Med Net obtained the 2000 policy for a total premium of $5,826 through Dianne Abernathy, an employee of the J. Smith Lanier Agency, an independent agency that offers its customers insurance coverage from a number of different insurance companies. Abernathy secured coverage from CCIC through North Alabama Insurance, Inc. ("NAI"), an intermediary insurance broker that had the authority to "bind" CCIC; Abernathy had no dealings directly with CCIC.
In late January 2001, as the expiration date of the 2000 policy was approaching, *Page 1171 
Abernathy contacted Robert Holley, Med Net's principal operator, and asked whether Holley wanted to "renew" coverage for another year. Acting on Holley's instructions, Abernathy requested NAI to provide a premium quotation for a "renewal" of the 2000 policy so as to cover a total of seven vans. NAI responded to Abernathy on January 31, indicating that although the 2000 policy was due to expire on February 17, 2001, CCIC would provide coverage to Med Net for an additional year on the same general terms as the expiring 2000 policy based upon a total premium of $15,078. That quotation was labeled "Renewal Quotation."
Abernathy sent a letter to Holley on February 8, 2001, indicating that she had one premium quotation for "renewal" for $15,078 but stating that she was "still [a]waiting a quote from another carrier" and that she hoped "to have that by Monday 2/12/01."[1] Abernathy and Holley subsequently discussed whether certain changes in coverage, such as the permitted radius from Med Net's headquarters that its vans could travel, could reduce Med Net's premium; a handwritten notation written by Abernathy on her copy of the February 8 letter to Holley indicates that Holley visited her office on February 14, three days before the 2000 policy was to expire, at which time Holley expressed a desire for "options for payments" and stated that he would return by Friday, February 16. However, there is no evidence that Holley authorized Abernathy to obtain insurance coverage for Med Net on the terms offered in NAI's January 31 "Renewal Quotation."
On Wednesday, February 14, Holley was informed that he would have to immediately undergo an exploratory medical procedure with respect to his heart. On Thursday, February 15, he entered a hospital, underwent the procedure, and left the hospital; however, based upon the results of that procedure, Holley was readmitted to the hospital the next day, Friday, February 16, and underwent a cardiac-bypass procedure on Monday, February 19. As a result of Holley's medical problems, Holley did not return to Abernathy's office, and Holley and Abernathy did not discuss Med Net's insurance coverage between February 15 and February 20.
On the morning of Wednesday, February 21, 2001, Abernathy's husband underwent an outpatient medical procedure at the same hospital where Holley was recuperating, and Abernathy accompanied her husband to the hospital. After that procedure was performed, Abernathy and her husband visited Holley's hospital room. During that visit, Holley asked Abernathy about Med Net's insurance coverage; Abernathy responded that Med Net did not have coverage because she had not heard from Holley and because she lacked authority to "bind" insurance coverage on Med Net's behalf. According to Abernathy, when Holley requested that Abernathy "get it fixed," i.e., immediately obtain insurance coverage, Abernathy informed Holley that she had accompanied her husband to the hospital and that she was not planning to return to the J. Smith Lanier Agency's office that day but that she could obtain coverage the next day. In contrast, Holley stated that he told Abernathy during that visit to "bind my coverage over" and that Abernathy responded that all Holley needed to do was to tell her to "handle it" and "it would be done"; Holley assumed that his statements to Abernathy amounted to a valid binder of insurance coverage. *Page 1172 
According to Wright's complaint against Med Net, Wright was injured on February 21, 2001, during Med Net's transportation of her to a kidney-dialysis appointment. Wright claims that she was injured as a result of Med Net's negligence or wantonness in securing her and her wheelchair into Med Net's automobile and in operating the automobile so as to cause her to fall over in transit.
On February 22, 2001, Abernathy completed a computerized "Quick On-Line Auto Quote Form" on behalf of Med Net and transmitted that form to NAI; she also contacted an employee of NAI by E-mail, stating in her message that Holley had been hospitalized unexpectedly and that she needed to obtain coverage immediately because Med Net could not operate without insurance coverage. NAI sent a document to the J. Smith Lanier Agency indicating that CCIC would agree to provide coverage for a total premium of $11,627, that an original completed and signed application form should be sent "within 10 days of binding," and that the coverage and terms being offered "may not be the same or as broad as requested in your application"; that quotation form, unlike the January 31 form, contained no references to the 2000 policy and was labeled "Quotation" rather than "Renewal Quotation." Abernathy wrote, on the face of that quotation form, a request that NAI immediately bind coverage and sent the quotation form containing the handwritten request back to NAI; on February 23, a binder was issued by NAI on behalf of CCIC indicating an effective date of February 22, 2001, for Policy Number CTP 335773, or "the 2001 policy." Because the acts made the basis of Wright's complaint occurred between the expiration of the 2000 policy and the inception of the 2001 policy, CCIC denied Med Net's request that CCIC defend and indemnify Med Net with respect to the claims alleged in Wright's complaint, contending that CCIC has no duty to do so.
CCIC's denial of coverage prompted Med Net to bring an action against Wright and CCIC; in that action, Med Net sought a declaration that CCIC was required to defend and indemnify Med Net with respect to Wright's claims against Med Net. CCIC denied liability and filed a motion for a summary judgment, relying upon certain deposition testimony; Med Net filed a response in opposition to CCIC's motion. The trial court denied the summary-judgment motion, after which the trial court held a hearing at which the parties presented evidence in the form of deposition transcripts and oral testimony. The trial court ultimately rendered a judgment in favor of Med Net, requiring CCIC to provide a defense in Wright's action against Med Net and to indemnify Med Net as to Wright's claims. CCIC appealed from that judgment to the Alabama Supreme Court, which transferred the appeal to this court pursuant to § 12-2-7(6), Ala. Code 1975.
The principal legal issue presented in this appeal is whether, under the evidence presented, the trial court could properly conclude that CCIC was bound to provide coverage to Med Net with respect to the occurrences described in Wright's complaint. Because the trial court received testimony in both oral and written form before entering its final judgment,[2] we conclude that the ore tenus standard of review applies; "[w]here evidence on an *Page 1173 
issue is presented both orally and by deposition, the ore tenus rule affords the trial court's finding a presumption of correctness." Hall v.Mazzone, 486 So.2d 408, 410 (Ala. 1986). "Under that standard, a trial court's findings of fact based on oral testimony and a judgment based on those findings are given a presumption of correctness." Beavers v. Countyof Walker, 645 So.2d 1365, 1372 (Ala. 1994). However, "that standard's presumption of correctness has no application to a trial court's conclusions on questions of law." Id.
We agree with CCIC that there is no evidentiary basis for the trial court to have concluded that the 2000 policy remained in effect on February 21, 2001, the date of Wright's alleged injuries. The 2000 policy, by its terms, expired on February 17, 2001, at 12:01 a.m., the end of the policy period shown on the policy's declarations page. Moreover, coverage under the 2001 policy, by its terms and the terms of the binder issued by NAI on behalf of CCIC, became effective on February 22, 2001, one day after the incident made the basis of Wright's complaint. As a result, no written contract of insurance was in effect between CCIC and Med Net on February 21, 2001.
In defense of the trial court's judgment, Med Net contends that the doctrine of waiver, as recognized in cases such as Alabama Farm BureauMutual Casualty Insurance Co. v. Hicks, 41 Ala. App. 143, 133 So.2d 217
(1960), aff'd, 272 Ala. 574, 133 So.2d 221 (1961), compels a conclusion that CCIC is required to povide coverage to Med Net. In affirming the judgment of the Court of Appeals that an insurer's acceptance of a past-due renewal premium after a loss, with knowledge of that loss, waived any forfeiture for nonpayment of a policy's renewal premium, the Alabama Supreme Court opined that the insurer "had the right to condition renewal or reinstatement of the policy on the exclusion of coverage between [the] date of default and [the] date of reinstatement or renewal."272 Ala. at 576, 133 So.2d at 223. Cases following Hicks have held that in instances when an insurer accepts a premium payment from an insured with knowledge that an otherwise-covered occurrence has happened during a period of lapse, the insurer may (1) return the premium for the lapsed period, (2) apply the premium from the date it was received forward, or (3) retain the premium and cover the loss. See, e.g., Allen v. Dairyland Ins. Co.,391 So.2d 109, 110 (Ala. 1980).
In this case, as in Allen, an insurer has effectively chosen the second option — CCIC applied Med Net's premium payments after February 22, 2001, so as to provide coverage from that date forward. Assuming, without deciding, that CCIC had knowledge of Wright's claim when it issued the 2001 policy with an effective date of February 22, 2001, there is no evidence in the record that CCIC or NAI, in issuing the February 22 premium quotation, the February 23 binder, and the 2001 policy, acted in any manner inconsistent with the position that the 2001 policy was a newpolicy with an effective date of February 22. Specifically, while NAI's January 31 "renewal quotation" stated that coverage would be bound "upon expiration of [the 2000] policy," that the terms and conditions of the coverage offered were "the same as [the] expiring [2000 policy] unless otherwise noted," and referred to the expiring 2000 policy by number, the February 22 "quotation" contained no reference to the 2000 policy. We therefore cannot agree with Med Net that the trial court's judgment is supported by the doctrine of waiver set forth in Hicks and its progeny.
We now turn to whether the trial court's judgment is due to be affirmed, as Med *Page 1174 
Net argues, because of Abernathy's relationship to CCIC. Stated another way, we now address whether the trial court could have correctly concluded that CCIC was bound to provide a defense and indemnity to Med Net with respect to the events alleged in Wright's complaint on the basis that Abernathy had actual or apparent authority to immediately bind coverage on behalf of CCIC at Holley's request.
In Ballard v. Lee, 671 So.2d 1368 (Ala. 1995),[3] the Alabama Supreme Court discussed at length the distinction recognized under our law between insurance "brokers" and insurance "agents":
 "The functions and characteristics of insurance `agents' and `brokers,' respectively, are set forth in Ala. Code 1975, § 27-7-1(a). That section defines those two terms:
 "'(1) Agent. A natural person, partnership or corporation appointed by an insurer to solicit and negotiate insurance contracts on its behalf, and if authorized to do so by the insurer, to effectuate, issue and countersign such contracts. An agent may not delegate the countersignature authority by appointing another person as his attorney-in-fact, except, that this provision shall not apply to agents for direct-writing insurers.
 "'(2) Broker. A natural person, partnership or corporation who, on behalf of the insured, for compensation as an independent contractor, for commission or fee and not being an agent of the insurer, solicits, negotiates or procures insurance or the renewal or continuance thereof, or in any manner aids therein, for insureds or prospective insureds other than himself or itself. Brokers cannot bind the insurer and all business produced must be countersigned by a resident agent of the insurer accepting the risk.'
 "(Emphasis added [in Ballard].) See, also, J. Appleman, Insurance Law and Practice § 8726, at 338 (1981) (`A broker is . . . one who acts as a middleman between the insured and insurer and . . . solicits insurance from the public under no employment from any special company').
". . . .
 "Ordinarily,'an insurance broker represents the insured and is not considered an agent of the insurer.' Lampkin v. Kelly, 771 S.W.2d 953, 954
(Mo.App. 1989). A broker usually acts solely as the insured's agent and `has a license to "hunt" for a suitable policy without having any prior representation contract with any particular insurer.' M. Pock, Insurance, 45 Mercer L. Rev. 253, 255 n. 15 (1993); see, also, J. Appleman, Insurance Law and Practice § 8727 (1981). Only `special conditions or circumstances in a particular case [will] warrant the inference that a broker is the agent of the insurer.' Lampkin, 771 S.W.2d at 954. These rules are essentially codified in Ala. Code 1975, § 27-7-1(a)(2), which expresses the intent of our legislature with regard to concurrent agency, namely, that in the usual case, a broker will not be regarded as `an agent of the insurer.' Id.
 "We are aware that a broker sometimes performs certain functions that benefit the insurer, such as delivering the insurer's policy to the insured, collecting premiums from the insured, and forwarding the proceeds of the premium to the insurer and, thus, that the broker *Page 1175 
may, for some purposes, represent the insurer. Hunt v. State, 737 S.W.2d 4 (Tex.App. 1987); see, also, American Fire Ins. Co. v. King Lumber Mfg. Co., 74 Fla. 130, 77 So. 168 (1917), affirmed, 250 U.S. 2, 39 S.Ct. 431, 63 L.Ed. 810 (1919). In § 27-7-1(a)(2), however, these activities are expressly, or by clear implication, ascribed to brokers. Thus, the broad application of this rule in Alabama would render anyone who `solicits, negotiates or procures insurance or the renewal or continuance thereof, or in any manner aids therein, for insureds or prospective insureds,' § 27-7-1(a)(2) (emphasis added [in Ballard]) — by which activities he qualifies as a broker — ipso facto an agent of the insurer. Such a result would contravene § 27-7-1(a)(2) and would be contrary to the policy of this state as declared by the legislature. Thus, where, in a damages action alleging fraud, a defendant insurer files a properly supported summary judgment motion, suggesting that the person who allegedly defrauded the plaintiff insured was a broker — which the plaintiff contends was a dual agent — the plaintiff's rebuttal evidence must relate to activities of the broker other than those mentioned in § 27-7-1(a)(2)."
Ballard, 671 So.2d at 1371-73.[4]
In this case, Med Net presented no evidence tending to show that CCIC appointed Abernathy or the J. Smith Lanier Agency to solicit, negotiate, effectuate, issue, or countersign insurance contracts on behalf of CCIC; Abernathy testified at her deposition that the J. Smith Lanier Agency had no direct contractual relationship with CCIC, that she had no direct dealings with CCIC, and that she had "no binding authority" with respect to CCIC. According to Abernathy's testimony, she could have placed Med Net's coverage with any insurer with which her agency had a "relationship" and that that placement would be based, in part, upon customer input; moreover, as we have noted, Abernathy sought premium quotations from competing insurers on behalf of Med Net with respect to coverage that would follow the expiration of the 2000 policy. Finally, Abernathy testified that the J. Smith Lanier Agency had retained fees of 10 % of the policy premiums to compensate it for its services in obtaining insurance coverage for Med Net. A review of that evidence in light of the legal principles enunciated in Ballard compels a conclusion that Abernathy acted as a broker on behalf of Med Net under § 27-7-1(a)(2) as discussed in Ballard, not as an employee of CCIC, and that CCIC is therefore not liable to Med Net on the basis of respondeat superior.
As noted in Ballard, Ala. Code 1975, § 27-7-1(a)(2), provided that brokers (such as Abernathy) "cannot bind the insurer" and that all insurance policies or binders they procure "must be countersigned by a resident agent of the insurer accepting the risk." Nevertheless, Alabama common law provides that "[u]nder certain circumstances . . . an independent broker may act as an agent for both the insured and the insurer." Gulf Gate Mgmt. Corp. v. St. Paul Surplus Lines Ins. Co.,646 So.2d 654, 659 (Ala. 1994). Thus, we must consider whether statements that Abernathy allegedly made to Holley in his hospital room on February 21, 2001, just before the accident made the basis of Wright's complaint, bound CCIC so as to create a legal duty in CCIC to provide coverage to Med Net as to the *Page 1176 
incident made the basis of Wright's complaint.
In Gulf Gate, our Supreme Court recognized the possibility that an insurance broker who represents a prospective insured can also be deemed to represent an insurer in certain limited instances. However, Gulf Gate
also stressed that "[a]n insurer's liability for the fraud of an independent agent or broker is predicated solely upon actual or apparent authority conferred upon the agent/broker by the insurer to make representations on the insurer's behalf"; the Supreme Court added that "an independent agent or broker can never impose liability upon the agent or broker's principal for representations that are not authorized by the principal" and that "[a]n agent's apparent authority must be based on the conduct of the principal and not on the conduct of the agent." 646 So.2d at 659.
Did Med Net adduce "substantial evidence" (see § 12-21-12, Ala. Code 1975, and West v. Founders Life Assurance Co. of Florida, 547 So.2d 870,871 (Ala. 1989)) that Abernathy had actual or apparent authority to enter into an insurance contract on behalf of CCIC with Med Net? We must answer that question in the negative. Abernathy expressly disclaimed in her deposition having had the unilateral authority to bind CCIC to any particular contract of insurance, and Med Net presented no evidence that would negate her testimony. Moreover, there is no evidence of conduct on the part of CCIC from which the trial court could properly have inferred that CCIC (or NAI) misled Med Net as to the extent of Abernathy's authority to act on behalf of NAI so as to permit a finding that Abernathy had apparent authority to bind CCIC; indeed, Holley testified at his deposition that he had never spoken to anyone from CCIC or NAI. While Med Net relies upon Holley's testimony that Abernathy stated that "all you have to do is tell me and I will take care of it" as constituting proof of her authority to act on behalf of CCIC, there is no evidence that CCIC ever indicated to Med Net that Abernathy could effectively make such a sweeping declaration on its behalf, much less that CCIC would agree to provide coverage from the very moment of its utterance. Absent evidence of an agency relationship between Abernathy and CCIC, CCIC cannot be bound by her representations. See Gulf Gate, 646 So.2d at 660; accord, Ballard, 671 So.2d at 1372-73.
In the absence of evidence that CCIC issued a binder or a policy of insurance that afforded coverage for the occurrences on February 21, 2001, alleged in Wright's complaint, and without evidence that Abernathy acted in any capacity other than as Med Net's broker, the trial court's judgment requiring CCIC to provide a defense and indemnity to Med Net with respect to Wright's claims against Med Net was erroneous. The trial court's judgment is reversed, and the cause is remanded for that court to enter a judgment in favor of CCIC.
REVERSED AND REMANDED WITH INSTRUCTIONS.
YATES, P.J., and CRAWLEY, THOMPSON, and MURDOCK, JJ., concur.
[1] That competing insurance carrier ultimately offered Med Net similar coverage, but the carrier quoted a substantially larger premium.
[2] Under the rule espoused in Superskate, Inc. v. Nolen, 641 So.2d 231
(Ala. 1994), and its progeny (e.g., Mitchell v. Folmar Associates,L.L.P., 854 So.2d 1115 (Ala. 2003)), we review the correctness of the trial court's final judgment, not its denial of CCIC's summary-judgment motion.
[3] State Farm Fire Casualty Co. v. Owen, 729 So.2d 834 (Ala. 1998), overruled Ballard solely as to the issue whether, in a fraud action, the question of a party's legal duty to disclose a fact is a question of fact or of law.
[4] Although § 27-7-1, Ala. Code 1975, was amended effective January 1, 2002, so as to delete the statutory definitions of "agent" and "broker" discussed in Ballard, the incidents on which this action is based occurred before the effective date of that amendment. *Page 1177