AMERICAN EQUITY INSURANCE
COMPANY, Plaintiff,

v.

LIGNETICS, INC.; Lignetics of West
Virginia, Inc.; Lignetics of Idaho,
Inc.; John Persinger; Jacky Persing-
er; Susan Persinger; and LeRoy Bog-
gess, Defendants,

and

Lignetics, Inc.; Lignetics of West
Virginia, Inc. Third–Party
Plaintiffs,

v.

Gary Conkey; Tom Hayes; and United
Agencies, Inc. Third–Party
Defendants.

No. CIV.A.1:01 CV 137.

United States District Court,
N.D. West Virginia.

Sept. 25, 2003.

Louis C. Long, Esquire, Meyer, Darragh, Buckler, Bebenek & Eck, Pittsburgh, PA, Counsel for Plaintiff American Equity Ins. Co.

James B. Lees, Jr., Esquire, Sharon M. Iskra, Esquire, Hunt & Lees, Charleston, WV, Counsel for Defendants Lignetics, Inc., Lignetics West Virginia, John Persinger, Jacky Persinger, Susan Persinger, and Lignetics of Idaho, Inc.

Timothy R. Miley, Esquire, Romano & Miley, Clarksburg, WV, Counsel for Defendant Leroy Boggess.

### ORDER

KEELEY, District Judge.

This matter comes before the Court on the motions for summary judgment of plaintiff American Equity Insurance Company; defendants Lignetics, Inc., Lignetics of West Virginia, Inc., and Lignetics of Idaho, Inc.; and third-party defendants United Agencies, Inc., Gary Conkey and Tom Hayes. American Equity Insurance Company's motion to sever and stay the third-party complaint is also before the Court. For the reasons that follow, the Court **DENIES** the parties' motions, except American Equity's motion for summary judgment, which it **GRANTS IN PART**.

### I.

### PROCEDURAL HISTORY

The plaintiff, American Equity Insurance Company ("American Equity"), initiated this civil action on September 13, 2001. Pursuant to 28 U.S.C. §§ 2201, *et seq.*, and W. Va.Code §§ 55–13–1, *et seq.*, its seeks a declaratory judgment that it

has no duty to defend or indemnify defendants Lignetics, Inc., Lignetics of West Virginia, Inc., or Lignetics of Idaho, Inc. (collectively, "Lignetics"), in connection with any and all claims asserted by John Persinger, Jacky Persinger, Susan Persinger (collectively, the "Persingers") and LeRoy Boggess, resulting from a March 11, 2001 accident at the Lignetics facility in Glenville, West Virginia. John Persinger ("Persinger") and LeRoy Boggess ("Boggess") were severely injured in the accident, which occurred in the course of their employment with Lignetics.[1]

On May 6, 2002, defendant Lignetics filed a third-party complaint seeking a declaratory judgment that American Equity and third-party defendants Gary Conkey, Tom Hayes, and United Agencies, Inc. (collectively, "United Agencies") have a duty to defend and indemnify it in connection with any and all claims asserted by the Persingers or Boggess as a result of the March 11, 2001 accident. Lignetics filed an amended third-party complaint on June 23, 2003 in which it added a counterclaim against American Equity, alleging that it breached its duty to provide coverage for the claims of the Persingers and Boggess.

On December 2, 2002, the Persingers, United Agencies, and American Equity filed cross-motions for summary judgment. American Equity also filed a motion to sever and stay Lignetics' third-party complaint.

■ In support of its motion to sever and stay, American Equity explains that Lignetics' "third-party complaint against the insurance agents United Agencies, Conkey and Hayes includes a claim for

---

1. Although the Persingers and Boggess had not filed suit in state court at the time American Equity filed the present action, American Equity filed a second amended complaint on May 16, 2003 to which it attached copies of complaints filed by the Persingers and Bog-

gess in the Circuit Court of Brooke County, West Virginia. In general, the plaintiffs' complaints seek relief pursuant to W. Va.Code § 23–4–2(c)(2) (the "deliberate intention" statute) and various theories of negligence.

costs of defense and indemnification in the underlying actions in the event that the court determines that American Equity . . . is under no duty to defend the underlying actions." American Equity argues that this issue is not ripe for determination because the underlying actions are in the early stages of development and, as a result, the third-party complaint should be severed and stayed.

The basis for American Equity's motion is a legal question involving the rights and duties of Lignetics and United Agencies, not American Equity. Furthermore, this legal issue is independent of the facts as they may be developed in the underlying actions. Finally, American Equity filed its motion on the morning of oral argument—after the parties had briefed their cross-motions for summary judgment. Staying the third-party complaint would delay a ruling on United Agencies' fully-briefed motion for summary judgment. For all these reasons, the Court **DENIES** American Equity's motion to sever and stay. Consequently, the Court moves on to a discussion of the issues presented by the parties' motions for summary judgment.

## II.

### *FACTUAL BACKGROUND*

Lignetics, Inc. is a California corporation that manufactures wood pellets for wood-burning stoves. The company opened a plant in Glenville, West Virginia in 1997, and also operates or has operated facilities in Idaho and Missouri.

When Lignetics opened its West Virginia facility, it asked United Agencies to obtain insurance coverage for it. At the time, United Agencies had procured insurance policies for Lignetics for nine years. United Agencies did not issue policies directly to Lignetics, but rather served as an

intermediary between Lignetics and its insurers. During the annual renewal of its policies, Lignetics worked with United Agencies rather than with the insurers who issued the policies.

During this renewal process, Lignetics claims it told United Agencies that it was relying on United Agencies to provide it with "all possible coverages for all possible contingencies." Lignetics admits, however, that it did not read its insurance policies and was unaware of what exclusions they included.

When determining what insurance Lignetics needed for its new operations, United Agencies recognized that, in West Virginia, Lignetics faced possible exposure to "employers' liability" suits, and that it would need to be insured against such claims brought by employees injured in the workplace. To cover this type of exposure, a business can either purchase " 'stop-gap' employers' liability insurance" from an insurance company, or it can purchase "excess" workers' compensation insurance from the workers' compensation fund in each state where it operates. Despite recognizing Lignetics' exposure, United Agencies did not recommend that Lignetics purchase either "stop-gap" or "excess" workers' compensation insurance. According to United Agencies, it mistakenly assumed that Lignetics, which purchased its own workers' compensation insurance at its other plants, had purchased the necessary "excess" insurance to cover this gap in its coverage in West Virginia.

In the fall of 2000, at the request of a key customer, Lignetics asked United Agencies to procure a different classification of insurance coverage. In response, United Agencies contacted American Equity, a surplus lines carrier, through an intermediary, Western Security Surplus, a surplus lines broker.[2] American Equity

**2.** "Surplus lines" or "excess lines" insurance is "specialized property or liability coverage

provided by a nonadmitted insurer in instanc-

subsequently issued a general commercial liability insurance policy to Lignetics. Although Lignetics paid for the policy on February 23, 2001, it did not receive the actual policy of insurance until May 10, 2001—two months after the accident at its West Virginia facility.

Although this was the first time American Equity had insured Lignetics, its policy was similar to previous policies procured by United Agencies for Lignetics and, like the other policies, included an exclusion for employers' liability.[3] American Equity asserts that, based on this exclusion, it has no duty to defend or indemnify Lignetics against any claims asserted by the Persingers or Boggess for injuries suffered as a result of the March 11, 2001 accident at the Lignetics facility.

## III.

### *STANDARD OF LAW*

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving par-

ty is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party. *Id.* at 255, 106 S.Ct. 2505.

The moving party has the burden of initially showing the absence of a genuine issue concerning any material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Once the moving party has met its initial burden, the burden shifts to the nonmoving party to "establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To discharge this burden, the nonmoving party cannot rely on its pleadings but instead must have evidence showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548.

es where it is unavailable from insurers licensed by the state." *Hallas v. Boehmke and Dobosz, Inc.*, 239 Conn. 658, 686 A.2d 491, 494 n. 6 (1997) (quoting *Barron's Business Guide, Dictionary of Insurance Terms* (3d ed. 1995)); *see generally* W. Va.Code § 33–12C (regulating the placement of insurance with excess lines insurers).

3. Set forth below is the employers' liability exclusion contained in the commercial general liability policy American Equity issued to Lignetics:
 2. Exclusions
 This insurance does not apply to:
 . . . .
 e. Employer's Liability

"Bodily injury" to:
(1) An "employee" of the insured arising out of and in the course of:
(a) Employment by the insured; or
(b) Performing duties related to the conduct of the insured's business; or
(2) The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph (1) above.
This exclusion applies:
(1) Whether the insured may be liable as an employer or in any other capacity; and
(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

## IV.

### DISCUSSION

#### A.

#### Questions Presented

The parties' motions for summary judgment present a number of questions:

1. Under the doctrine of reasonable expectations, is American Equity, as a matter or law, obligated to insure Lignetics against any claims asserted by the Persingers or Boggess?

2. Does the doctrine of reasonable expectations apply to the present case if the employers' liability exclusion contained in the American Equity insurance policy clearly and unambiguously excludes coverage for Persinger's and Boggess' injuries?

3. If the reasonable expectation doctrine does apply, was Lignetics unreasonable in believing that it was insured for this type of accident?

4. Did United Agencies have an oral or implied insurance contract with Lignetics that covered the Persingers' and Boggess' injuries?

5. In its dealings with Lignetics, was United Agencies an agent of American Equity?

#### B.

#### The Doctrine of Reasonable Expectations

United Agencies and American Equity argue that the doctrine of reasonable expectations is inapplicable to the present case because the employers' liability exclusion in the insurance contract is clear and unambiguous. The Persingers and Lignetics, on the other hand, argue that ambiguity is no longer a prerequisite for application of the doctrine in West Virginia.

■ In West Virginia, "the doctrine of reasonable expectations is that the objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations." *Nat'l Mut. Ins. Co. v. McMahon & Sons, Inc.*, 177 W.Va. 734, 356 S.E.2d 488, 495 (1987). Furthermore, "[a]n insurer wishing to avoid liability on a policy purporting to give general or comprehensive coverage must make exclusionary clauses conspicuous, plain, and clear, placing them in such a fashion as to make obvious their relationship to other policy terms, and must bring such provisions to the attention of the insured." *Id.* at 496.

■ Initially, the doctrine of reasonable expectations was considered a canon of construction and thus applied only to ambiguous insurance contracts. *Id.* The language of an insurance policy provision is considered ambiguous when it is reasonably susceptible to two different meanings, or reasonable minds might be uncertain or disagree as to its meaning. *Riffe v. Home Finders Assoc., Inc.*, 205 W.Va. 216, 517 S.E.2d 313, 318 (1999). In the present case, Lignetics does not contend that the employers' liability exclusion in its policy is ambiguous, and, indeed, examination of the provision makes plain that it excludes coverage for injuries like those suffered by the Persingers and Boggess. Therefore, as a matter of law, the disputed provision is clear and unambiguous.

Despite that, the doctrine of reasonable expectations may apply to this case due to a line of cases in West Virginia extending the doctrine beyond circumstances involving ambiguous policy language. In *Romano v. New England Mut. Life Ins. Co.*, 178 W.Va. 523, 362 S.E.2d 334 (1987), West Virginia's highest court refused to apply a policy exclusion when promotional materials provided to the insured did not alert him to the exclusion and, on the contrary, led him to a reasonable belief that he was covered under the policy. *Id.* at 340.

The court has also applied the doctrine to situations involving misconceptions about the coverage that had been sold. In the seminal case of *Keller v. First Nat'l Bank*, 184 W.Va. 681, 403 S.E.2d 424 (1991), the court held that, after a bank's offer to insure had been accepted with consideration, the bank had created an expectation of credit life insurance in the insured even though the bank's offer to insure had been made by mistake. *Id.* at 429. As a result, the bank could not deny coverage after it failed to adequately notify the insured that its offer of insurance was erroneous. *Id.* When discussing the holding in *Keller* in a subsequent opinion, the court stated that "procedures which foster a misconception about the insurance to be purchased may be considered with regard to the doctrine of reasonable expectation of insurance." *Costello v. Costello*, 195 W.Va. 349, 465 S.E.2d 620, 623–24 (1995) (per curiam) (finding that an insurance agent's conduct may have created a reasonable expectation of insurance, and noting that *Keller* expanded the doctrine of reasonable expectations beyond circumstances involving ambiguous policy language).

In *Burlington Ins. Co. v. Shipp*, 2000 WL 620307, at *1 (4th Cir. May 15, 2000) (unpublished) (per curiam) [4], a panel of the Fourth Circuit considered an insurance dispute arising in West Virginia. After review of both *Romano* and *Keller*, the panel concluded that, in West Virginia, "an insured may have a reasonable expectation of insurance coverage when the policy provision on which a denial of coverage is based, although clear and unambiguous, was never communicated to the insured." *Id.* at *3. The district court had found that the insurer had relied on a clear and un-

ambiguous exclusion when denying coverage. The panel however, concluded that the insured could rely on the doctrine of reasonable expectations to establish coverage where she had been assured of coverage and the exclusion had not been brought to her attention. *Id.* at *2, *4. In particular, it concluded that "[the insured's] reasonable expectation of coverage could not be negated as a matter of law by a clear and unambiguous policy exclusion that was never communicated to her." *Id.* at *4.

■ Although *Burlington* is an unpublished decision, it suggests that, under West Virginia law, the reasonable expectation doctrine applies in situations similar to the one under review here. Admittedly, Lignetics did not seek specific assurances that it had employers' liability coverage, and any assurances United Agencies provided were general and unspecific. Nevertheless, as the majority in *Burlington* concluded, the reasonable expectation doctrine may apply when an exclusion is not communicated to the insured. In light of that reasoning, whether Lignetics was reasonable in relying on United Agencies' assurance is a question of fact that does not prevent operation of the doctrine.

American Equity urges the Court to disregard the reasoning in *Burlington* because it is an unpublished and, in American Equity's opinion, wrongly decided case. It directs the Court to the dissent in *Burlington*, which concludes that an insurer can rely on a clear and unambiguous exclusion when an agent's assurances are general and unspecified. *Burlington*, 2000 WL 620307, at *7 (Niemeyer, J., dissenting). American Equity argues that the

---

**4.** Pursuant to Fourth Circuit Local Rule 36(c), unpublished opinions are not binding as precedent and citation of unpublished opinions is disfavored. Nevertheless, Rule 36(c) does not prohibit the citation of unpublished opinions.

In the case at bar, the court is not citing *Burlington* as precedent, but only for its well-reasoned distillation of West Virginia insurance law. The Court has attached a copy of *Burlington* to this Order.

dissent properly interprets the law, and predicts that, if the majority's opinion is indeed the law, it will adversely impact the insurance industry because insurers will not be able to bind coverage for an insured prior to issuance of the policy.

The majority's response to the dissent explains that its decision only upheld a jury's finding that a reasonable expectation of insurance existed under the particular circumstances of the case, and it did not decide that there is always a reasonable expectation of coverage, as a matter of law, whenever an exclusion is not communicated to an insured. *Burlington,* 2000 WL 620307, at *4, n. 2.

■ Despite American Equity's and United Agencies' arguments to the contrary, in West Virginia, ambiguity is no longer a prerequisite for application of the doctrine of reasonable expectations. Both *Romano* and *Keller* establish that the doctrine may apply in situations where an insurer attempts to deny coverage based on an exclusion that was not communicated to the insured, or where there is a misconception about the insurance purchased.

■ Accordingly, this Court concludes as a matter of law that the doctrine of reasonable expectations applies to this case and that there are factual questions related to this issue that preclude disposing of the case on the motions of United Agencies and American Equity. Therefore, it **DENIES** United Agencies' and American Equity's motions for summary judgment as they relate to this issue.

### C.

*Lignetics' Expectation of Insurance*

■ Even if the doctrine of reasonable expectation applies to this case, both American Equity and United Agencies contend that Lignetics was unreasonable in believing it was insured against the type of injuries the Persingers and Boggess

allegedly suffered. Under the doctrine, an insured's belief that it has insurance must be *objectively* reasonable. *McMahon,* 356 S.E.2d at 495.

■ In this case, American Equity and United Agencies both argue that Lignetics' belief regarding coverage was unreasonable. They base this on the fact that, for several years, Lignetics had operated under similar insurance policies that included employers' liability exclusions, and, thus, was familiar with this type of insurance. Moreover, Lignetics had previously obtained its own workers' compensation insurance for its other plants without the assistance of United Agencies. Finally, United Agencies claims that it did nothing that would lead Lignetics to believe it was obtaining employers' liability insurance for Lignetics.

Lignetics and the Persingers contend that Lignetics reasonably believed it was insured against accidents like the kind suffered by Persinger and Boggess because no one had brought the employers' liability exclusion to its attention. Although Lignetics admits it never read its prior policies containing similar employers' liability exclusionary language, it claims to have asked United Agencies to provide it with "all possible coverages for all possible contingencies." In support of these arguments, Lignetics points to the testimony of Gary Conkey, United Agencies' agent, who admitted during deposition testimony that he had erred first in not recommending that Lignetics purchase employers' liability insurance and, second, in assuming Lignetics had purchased such coverage on its own.

In *Keller,* the West Virginia Supreme Court noted that "action[s] based on a reasonable expectation of insurance usually will raise substantial questions of fact." 403 S.E.2d at 428. The competing allegations made by the parties in the present

case bear out this general rule; despite their motions, the parties have failed to eliminate several genuine issues of material fact. In particular, at this stage, the Persingers have not established that Lignetics was objectively reasonable when it failed to read its past insurance policies, failed to educate itself about employers' liability exclusions, and relied on United Agencies to procure for it all necessary insurance. Nor have United Agencies and American Equity established that Lignetics was unreasonable, as a matter of law, in believing that it had insurance to cover accidents occurring to its employees in the course of their employment.

These questions of fact are significant and need further development at trial. Therefore, the Court **DENIES** the parties' competing motions for summary judgment on the issue of Lignetics' reasonable expectation of insurance.

### D.

### *Agency*

Because a question of fact exists as to whether Lignetics may have been objectively reasonable, although mistaken, in believing it was insured against the type of accident the Persingers and Boggess suffered, the next, and perhaps the more difficult question, in this case becomes who might be liable for Lignetics' mistaken belief. The key issue is whether United Agencies was acting as an agent for American Equity when it procured insurance for Lignetics. If it was, then any negligence by United Agencies could be imputed to American Equity.

 Section 33–12–22 of the West Virginia Code specifically establishes that a person who solicits an application for insurance is the agent of the insurer, not the insured. *See also Benson v. Cont'l Ins. Co.*, 120 F.Supp.2d 593, 595 (S.D.W.Va.2000); *Smithson v. United States Fid. & Guar. Co.*, 186 W.Va. 195,

411 S.E.2d 850, 859 (1991) (citing *Knapp v. Independence Life Acc. Ins. Co.*, 146 W.Va. 163, 118 S.E.2d 631, 635 (1961), for the proposition that "the solicitor of the application for insurance should be regarded for all purposes as the agent of the insurer in any controversy between it and the insured or his beneficiary").

 American Equity, a surplus lines carrier, argues that United Agencies is not its agent because American Equity did not have any direct contact with anyone from United Agencies. Indeed, United Agencies placed Lignetics' application for insurance with American Equity through Western Security Surplus, a surplus lines broker that served as an intermediary between United Agencies and American Equity. American Equity recognizes that § 33–12–22 statutorily defines an insurance agent as the agent of the insurer rather than the insured, but argues that this statute, and the cases interpreting it, only apply to the relationship between an insurance agent and a standard lines carrier, not a surplus lines carrier.

American Equity's argument is supported by the introductory section of Article 33, which states that "[t]his article does not apply to excess line and surplus line agents and brokers ...." W. Va.Code § 33–12–1. The West Virginia legislature's choice of language in this section of the insurance statute suggests that it recognized a difference between the standard insurance industry and the specialized market of surplus insurance. As such, § 33–12–22 does not conclusively answer the agency question presented in this case.

Turning to the case law, West Virginia's courts have not considered the issue of agency in the surplus lines carrier context. A number of courts from other states have addressed the question, however. In *Carolina Casualty Ins. Co. v. Miss Deanna's Child Care–Med Net, L.L.C.*, —— So.2d

——, 2003 WL 21674195, *1–*2 (Ala.Civ. App.2003), the insured, Med Net, brought an action against a surplus lines automobile insurer, Carolina Casualty Insurance Company ("CCIC"), after CCIC refused to defend and indemnify Med Net when it was named the defendant in a negligence action.

The Alabama court described the relationship between Med Net and CCIC and explained that Med Net had obtained its surplus lines policy through an independent insurance agency which, in turn, had secured coverage from CCIC through an intermediary insurance broker with authority to bind CCIC. *Id.* at *1, —— So.2d at ——. The insurance agency had no direct dealings with CCIC. *Id.*

The court found no evidence that CCIC, the surplus lines insurer, appointed the insurance agent to negotiate insurance contracts on its behalf. *Id.* at *5, —— So.2d at ——. Furthermore, the agent testified that she had no contractual relationship with CCIC and she had no binding authority with respect to it. *Id.* Moreover, the agent testified that she could have placed Med Net's coverage with any insurer with which her agency had a relationship. *Id.* Based on this evidence, the court concluded that the insurance agent acted as a broker on behalf of Med Net and not as an employee of CCIC. *Id.* Consequently, the court concluded that the independent insurance agency had neither actual nor apparent authority to act on behalf of CCIC. *Id.* at *6, —— So.2d at ——.

The Connecticut Supreme Court faced a similar question in *Hallas v. Boehmke and Dobosz, Inc.*, 239 Conn. 658, 686 A.2d 491, 493 (1997), where it examined an excess lines insurer's liability for a broker's negligence. In *Hallas*, the insured requested excess lines insurance coverage from an insurance agent, Dobosz, who forwarded his application to an excess lines insurance broker, who in turn forwarded the application to an agent of the excess lines insurer, Scottsdale Insurance Company ("Scottsdale"). *Id.* at 494. Scottsdale's agent then bound coverage on behalf of Scottsdale. *Id.*

After suffering a fire loss, Hallas brought an action against Scottsdale to recover for Dobosz's negligence in obtaining the insurance. *Id.* The court concluded that there was no evidence to establish an agency relationship between Dobosz and Scottsdale, *id.* at 499, explaining that Dobosz had testified he had no authority to bind Scottsdale. Hallas was aware that Dobosz could not himself issue the policy Hallas sought, and consequently had arranged the insurance, not from Scottsdale directly, but through an excess lines insurance broker. *Id.* Under these circumstances, "no reasonable juror could find actual or implied agency . . . ." [5] *Id.*

In West Virginia, the Supreme Court of Appeals has defined an agent as "a representative of his principal in business or contractual relations with third persons . . . ." *Teter v. Old Colony Co.*, 190 W.Va.

---

**5.** United Agencies has directed the Court to a number of cases holding that insurance agents are generally considered to be the agents of insurers and not insureds. These cases are materially distinguishable from the present situation, however, because they involved standard lines insurance carriers rather than the specialized market of surplus lines insurance.

For its part, American Equity had directed the Court to *United Capitol Ins. Co. v. Kapiloff*, 155 F.3d 488 (4th Cir.1998) and *International Surplus Lines Ins. Co. v. Marsh & McLennan, Inc.*, 838 F.2d 124 (4th Cir.1988). Although *Kapiloff and Marsh & McLennan* involved surplus lines insurers, they too are distinguishable because they analyzed the relationship between surplus lines brokers (a position occupied in this case by Western Security Surplus) and surplus lines insurers. *Kapiloff*, 155 F.3d at 491, 498; *Marsh & McLennan*, 838 F.2d at 125, 127.

711, 441 S.E.2d 728, 736 (1994) (quoted authority omitted). The court explained that "[a] principal is bound by acts of an agent if those acts are either within the authority the principal has actually given his agent, or within the apparent authority that the principal has knowingly permitted the agent to assume." *Thompson v. Stuckey,* 171 W.Va. 483, 300 S.E.2d 295, 299 (1983) (citation omitted).

West Virginia's highest court has further explained that "one of the essential elements of an agency relationship is the existence of some degree of control by the principal over the conduct and activities of the agent." *Teter,* 441 S.E.2d at 736 (citing 3 Am.Jur.2d, *Agency* § 2 (1986)). To establish an agency relationship, therefore, requires the "manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Syl. Pt. 3, *Cole v. Fairchild,* 198 W.Va. 736, 482 S.E.2d 913, 923 (1996) (citing *Restatement (Second) of Agency* § 1 (1957)).

"In addition to actual authority, an agent can bind a principal based on apparent authority . . . ." *Clint Hurt & Assocs., Inc. v. Rare Earth Energy, Inc.,* 198 W.Va. 320, 480 S.E.2d 529, 536 (1996). To establish apparent authority, the following three elements must be shown:

(1) [T]hat the principal has manifested his consent to the exercise of such authority or has knowingly permitted the agent to assume the exercise of such authority; (2) that the third person knew of the facts and, acting in good faith, had reason to believe, and did actually believe, that the agent possessed such authority; and (3) that the third person, relying on such appearance of authority, has changed his position and will be injured or suffer loss if the act done or transaction executed by the agent does not bind the principal.

*Id.* (quoting 3 Am. Jr.2d, *Agency* § 80 (1986)).

In the present case, there is no evidence that American Equity appointed United Agencies to "solicit, negotiate, effectuate, issue or countersign insurance contracts on behalf of [American Equity]." *Carolina Casualty,* 2003 WL 21674195 at *5, —— So.2d at ——. Indeed, Gary Conkey, the United Agencies' agent primarily responsible for Lignetics' coverage, testified at his deposition that he had no direct dealings with American Equity, that neither he nor United Agencies had any agency contract with American Equity, and that neither he nor United Agencies had any binding authority on behalf of American Equity. Conkey further testified that United Agencies was required to go through a broker to obtain a quote from American Equity because United Agencies did not have "an excess surplus license."

Like the insurance agencies in *Carolina Casualty* and *Hallas,* United Agencies placed Lignetics' policy through a surplus lines broker serving as an intermediary between it and the insurer. United Agencies had no direct contact with American Equity; indeed, by law, it could not. In addition, like the agents in *Carolina Casualty* and *Hallas,* United Agencies' agents had no binding authority on behalf of American Equity.

Moreover, there was no "manifestation of consent" by American Equity that United Agencies could act on its behalf, nor was there any suggestion that American Equity exercised control over United Agencies—both prerequisites for an agency relationship under West Virginia law. Furthermore, nothing in the record of this case suggests that American Equity knowingly permitted United Agencies to act as if it had binding authority on American Equity's behalf. Consequently, United

Agencies lacked apparent authority to bind American Equity.

Having determined that United Agencies had neither actual nor apparent authority to act on American Equity's behalf, the Court concludes that any negligence on the part of United Agencies cannot be imputed to American Equity. It, therefore, **DENIES** United Agencies' motion for summary judgment and **GRANTS** American Equity's motion for summary judgment as they relate to this issue.

### E.

*Oral or Implied Contract of Insurance*

■ Lignetics claims it had an oral or implied contract of insurance with United Agencies that provided coverage for the injuries to the Persingers and Boggess. In West Virginia, "[t]he fundamentals of a legal contract are competent parties, legal subject matter, valuable consideration and mutual assent. There can be no contract if there is one of these essential elements upon which the minds of the parties are not in agreement." *Hart v. Nat'l Collegiate Athletic Assoc.*, 209 W.Va. 543, 550 S.E.2d 79, 86 (2001) (per curiam) (citations omitted). "An implied contract 'presupposes an obligation arising from mutual agreement and intent to promise but where the agreement and promise have not been expressed in words.'" *Id.* (citations omitted).

In the field of insurance law, the West Virginia Supreme Court of Appeals has explained that "[a]n insurance contract, similar to other contracts, 'is an offer and acceptance supported by consideration.'" *Keller*, 403 S.E.2d at 427. "The application for insurance is the offer, which the insurer then decides to accept, reject or modify. The insurer then issues a policy or certificate of insurance that evidences the insurance contract." *Id.*

■ In the present case, Lignetics claims it made an offer to procure insurance to United Agencies. United Agencies then transmitted this offer to American Equity, and American Equity accepted the offer when it issued the policy of insurance. Furthermore, Lignetics claims its payment of the premium was consideration supporting the contract of insurance.

A key element of contract formation is missing from Lignetics' characterization of the transaction, however, because a factual question exists as to whether there was mutual assent to the contents of the contract. In particular, as noted earlier, Lignetics contends it believed it was buying "all possible coverages for all possible contingencies." United Agencies and American Equity, however, argue that such a sweeping expectation of coverage was unreasonable and that they would not have assented to such terms. Lignetics contends that any misunderstanding about the scope of coverage was United Agencies' unilateral mistake and, therefore, cannot void the contract. It is equally plausible, however, that the gap in coverage was created by a mutual, rather than unilateral mistake, and, as a result, the contract is indeed voidable. The scope of coverage, if any, to which the parties agreed is a material question of fact which the Court cannot determine as a matter of law. Therefore, the Court **DENIES** United Agencies' motion for summary judgment on this issue.

### V.

### *CONCLUSION*

For the preceding reasons, the Court:

**DENIES** American Equity's motion to sever and stay Lignetics' third-party complaint (dkt. no. 78);

**DENIES** the Persingers' motion for summary judgment (dkt. no. 51);

**DENIES** United Agencies' motion for summary judgment (dkt. no. 52); and

**DENIES IN PART** and **GRANTS IN PART** American Equity's motion for summary judgment (dkt. no. 53).

The Court further **DIRECTS** the parties to submit a proposed scheduling order governing further preparation of this case within **30 days** upon entry of this Order.

It is so **ORDERED.**

The Clerk is directed to mail copies of this order to counsel of record.