Certain persons, including David Powell, acting individually and as administrator of the estate of Sonia Powell, filed a wrongful death action against Gulf Gate Management Corporation (hereinafter "Gulf Gate") and George Bode and Scott Bode, each individually and as a director of Gulf Gate, alleging negligence, wantonness, and violations of the Dram Shop Act. David Powell alleged that Gulf Gate sold alcoholic beverages to an individual who was already intoxicated and who subsequently caused an automobile accident that resulted in Sonia Powell's death. Gulf Gate filed a third-party complaint against St. Paul Surplus Lines Insurance Company (hereinafter "St. Paul"); Swett Crawford Group; Swett Insurance Managers, Inc., a subsidiary of Swett Crawford Group and formerly doing business as Dana Roehrig Associates, Inc. (hereinafter referred to as "Roehrig"); Loretta M. Giovine, individually and as an agent for Roehrig; Michael W. Norwood and Joseph McCarron, each individually and doing business as The Norwood Agency; and Alliance Insurance Group (hereinafter "Alliance"), seeking, among other things, damages for breach of contract, bad faith failure to pay, misrepresentation, and negligent failure to procure insurance; Gulf Gate also sought a judgment declaring that St. Paul and Alliance were required to defend and indemnify the Bodes in the underlying wrongful death action.
The trial court entered a summary judgment for Alliance and certified that judgment as final, pursuant to Rule 54(b), Ala.R.Civ.P. This Court affirmed that judgment in Gulf GateManagement Corp. v. Alliance Insurance Group, 638 So.2d 862
(Ala. 1994). The court subsequently entered a summary judgment for St. Paul, holding that it was not an insurer of Gulf Gates and owed no duty to defend or indemnify it in the underlying action. The court certified that judgment as final under Rule 54(b); Gulf Gate appeals.
A summary judgment is proper and must be affirmed where there exists no genuine issue of material fact and the movant is entitled to a judgment as a matter of law. Rule 56(c), A.R.Civ.P.
The undisputed facts are as follows: St. Paul is a "surplus line" insurance company; that is, it is an insurer that is not licensed in Alabama, but that can issue policies to parties within this state through designated surplus line insurance brokers. As of 1990, Roehrig was an independent insurance broker that did business with St. Paul, as well as with other insurers. Roehrig had a surplus line broker agreement with St. Paul, which stated, in pertinent part:
"Authority
 "The Broker is hereby authorized by [St. Paul] to solicit proposals of insurance on their behalf, subject to the terms and conditions hereinafter set forth. The Broker is an independent contractor and not an agent or employee of [St. Paul]. The Broker has no authority to issue binders, policies, endorsements or insurance certificates or to otherwise bind coverage on behalf of [St. Paul] and has no authority to make representations on behalf of [St. Paul], including, but not limited to, representations regarding the application of coverage *Page 656 
to specific situations, except where otherwise agreed in writing by [St. Paul]. All proposals of insurance must be submitted to [St. Paul] and approved by [St. Paul] prior to binding coverage."
Although, under this agreement, Roehrig was not authorized as an agent for St. Paul, Linda Giovine, a Roehrig employee, was authorized individually by letter to underwrite St. Paul policies. Under the terms of her letter of authority from St. Paul, Giovine was authorized to "produce, underwrite, quote, issue and service policies" or to "decline individual risks submitted to her" if she chose to. Giovine could not assign or delegate this express written authority to any other individual or entity, including her employer, Roehrig. Generally, independent insurance agents or brokers would contact Giovine to obtain insurance for their clients and she would issue applications. She would prepare individualized quote letters to fit the special requirements and liabilities of each prospective client and would vary the conditions of coverage accordingly. If an application was acceptable and the prospective insured complied with the terms of her quote letter, Giovine was authorized to issue a "binder," i.e., a temporary contract for insurance, which would last 30 days. At the end of that time, permanent coverage would issue or coverage would cease. Giovine prepared many quote letters and had an approximate 15% "hit rate"; that is, about 15 of every 100 quotes she sent to the agents of prospective insureds actually culminated in a binding insurance policy.
In January 1990, the Bodes were the sole stockholders and directors of Gulf Gate, which they incorporated to operate Gulf Gate Lodge, a restaurant and bar. An independent insurance broker, Norwood Agency, contacted them to sell them a liquor law liability policy for their business. Norwood Agency was licensed as a property/casualty agent, but, in order to place surplus line coverage for the Bodes with St. Paul, it was required to hold a "surplus line broker" license as well. Norwood Agency did not have a surplus line broker license at that time, but was in the process of acquiring one through a "producer agreement" with Roehrig. Although the producer agreement was not yet final, Joseph McCarron, an agent at Norwood Agency, contacted Giovine to request a quote of insurance terms and an application for the Bodes. Giovine sent him an application for insurance, which contained the following provision:
 "Signing this application does not bind the company to complete the insurance. If a policy is issued to you, this application will be incorporated into the policy and become part of it. All information requested in this application is considered material and important. If the company agrees to be bound under the terms of this application, your policy is void if you hide any important information from us, mislead us, or attempt to defraud or lie to us about any matter contained in this application. Nothing in this application represents the extent or limits of your coverage. For such information, you must read the Coverage Section in your policy."
(Emphasis in original.) McCarron completed that application on behalf of the Bodes and returned it to Giovine.
Norwood Agency thereafter completed the producer agreement with Roehrig, and the agreement went into effect on February 15, 1990. The producer agreement established Norwood Agency's credit with Roehrig and enabled Norwood Agency to purchase surplus line policies for Gulf Gate and other clients. Norwood Agency was responsible for paying the premiums on these policies "no later than ten days after the statement date." The producer agreement also provided, however, that any special credit terms "contained in a quotation letter or binder would supersede this agreement."
With the producer agreement in effect on February 15, Giovine sent McCarron a quote letter on the liquor liability policy for which Gulf Gate had applied. This letter read:
"February 15, 1990
 "The Norwood Agency of Baldwin County 26280 Canal Road Orange Beach, AL 36561
 "Attn: Joe McCarron *Page 657 
"Re: Gulf Gate Management Corp. LIQUOR LIABILITY QUOTATION
 "Dear Joe: "Based on the information received on the captioned account, we can offer the following quote: "COVERAGE: LIQUOR LIABILITY "LIMIT: $500,000 Each Common Cause/Aggregate "PREMIUM: $5,220.00 100.00 Policy Fee RETAILER TO HANDLE TAXES "RATE: 3.48 per $100 receipts "CONDITIONS: __________ CLAIMS MADE RETRO DATE: __________ XX________ OCCURRENCE FORM "COMPANY: St. Paul Surplus Lines Company "CONDITIONS TO BIND: Subject to audit Premium is minimum and deposit Net premium prior to binding
Confirmation in writing with above conditions to bind.
 "Thank you for the opportunity to quote this risk for your office and will look forward to hearing from you again soon.
 "Very truly yours, "s/ __________ "Loretta M. Giovine "Property/Casualty Manager"
(Emphasis added.) George Bode thereafter signed a "Note and Premium Contract" with Norwood Agency to finance the liquor liability policy premium and the premium of another unrelated worker's compensation policy for Gulf Gate. Pursuant to the premium contract, the Bodes made a down payment of $2423.20 to Norwood Agency on February 21, 1990, and Gulf Gate obtained a $7269.60 loan from First Alabama Bank of Mobile (hereinafter "First Alabama") to finance the remainder of the premium. The premium contract granted to Norwood Agency a security interest in the policies and to any unearned or returned premium related to them, and further named Norwood Agency as Gulf Gate's "irrevocable attorney in fact" to cancel and/or terminate the policies.
McCarron prepared a memorandum to Giovine on February 22, 1990, which stated: "Please bind liquor legal per quote of 2/15/90 and issue policy." It is disputed as to whether he mailed the memorandum. It is undisputed that he never sent the "net premium" to Giovine, as required in the "Conditions to Bind" portion of her quote letter. On March 6, Norwood Agency received the balance of the premium from First Alabama, but did not follow up to make sure that the policy was issued to the Bodes. Norwood Agency never received a written binder or policy from Giovine or from St. Paul.
As a surplus line broker, Norwood Agency is required to file a certificate with the Alabama Department of Insurance to report the issuance of a surplus line policy within 30 days of the issuance of the policy; it did not file a certificate to evidence coverage for the Bodes. Norwood Agency is required to file an annual statement of all surplus line insurance transacted, but it did not list a St. Paul policy for the Bodes on its 1990 filing.
The Bodes thereafter made only one payment on the First Alabama premium contract for the financing of the liquor liability and worker's compensation policies. On July 17, 1990, the Bodes informed McCarron that Gulf Gate was ceasing operations and instructed him to cancel the St. Paul policy. George Bode confirmed the cancellation in a letter to McCarron written five days later; the letter stated that the policy "should be canceled on the day you were first informed of such, i.e., July 17, 1990." When he received this letter, McCarron telephoned Norwood Agency's main office and told a representative, Sharon Boyes, to cancel the policy. She faxed a memorandum to McCarron, stating *Page 658 
that she did not have the policy on file. McCarron found that he did not have a copy of it in his files either and asked Boyes to contact a Swett Crawford Group representative to find out about the policy. Boyes spoke with two Swett 
Crawford Group representatives, who told her they had never received a response to Giovine's quote letter to McCarron and that no St. Paul coverage was ever issued to the Bodes. Norwood Agency did not inform Giovine or Boyes that it had collected premiums from Gulf Gate for this nonexistent policy, nor did it make further contact with them about the matter.
Norwood Agency, under its recourse agreement, sent First Alabama a check equal to four payments on the worker's compensation/liquor liability insurance contract through August 21, 1990, and paid off the balance of the contract on September 27, 1990. In October 1990, the Bodes wrote McCarron, asking for an accounting of the liquor liability policy to confirm that it had been canceled, but they received no reply.
In November 1990, an intoxicated Gulf Gate Lodge patron left the restaurant and was involved in an automobile collision that killed Sonia Powell. David Powell filed the underlying Dram Shop Act action in 1991. On December 31, 1991, George Bode wrote to St. Paul's home office to find out about the policy. After investigating the matter with Roehrig and Norwood Agency, St. Paul sent Bode a letter informing him that the policy was never issued.
On June 22, 1992, Norwood Agency sent the Bodes an accounting of premiums and refunds on various policies it had obtained for Gulf Gate and enclosed a check for $4943.61. The accounting showed that Norwood Agency never forwarded any funds to St. Paul for a liquor liability policy, and it did not show any earned premium charge for such a policy. Gulf Gate, as a defendant in the underlying Dram Shop Act action, thereafter filed this third-party declaratory action.
Gulf Gate concedes that St. Paul never received a premium payment for the coverage and that it never received a written insurance contract. It argues, however, that there are genuine issues of material fact as to whether Giovine's February 15 quote letter and McCarron's memorandum instructing Giovine to bind the coverage pursuant to the terms of the quote letter were sufficient to establish coverage. Gulf Gate emphasizes that the evidence is sharply disputed as to whether Giovine received McCarron's March 6 memorandum. The evidence shows that, after receiving Giovine's quote letter and application form, McCarron prepared a memorandum asking her to bind the coverage. In deposition, he testified that he usually records any letters he faxes and that, because he could not find any record of a faxed memorandum to Giovine, he must have mailed it to her. Giovine testified that she never received any memorandum from McCarron by mail or by fax and had thereafter considered the Gulf Gate application to be merely another one of the many would-be clients she sent quote letters to but who never actually obtained insurance. We agree that this testimony creates an issue of fact as to whether McCarron's memorandum was sent and received; however, we must closely examine whether this issue is a material one.
We note that an insurance company can contract to provide insurance without a written policy, provided that the essential terms of an insurance contract are agreed upon. Powell v. StateFarm Mut. Auto. Ins. Co., 601 So.2d 60 (Ala. 1992). The essential terms of an insurance contract are the rate of premium, the duration of the policy, the nature of the risk, a description of the property or person or interest to be insured and its location, and the amount of insurance. Powell. If Giovine's quote letter contained these essential terms, then the issue of whether McCarron sent a memorandum instructing her to bind the coverage pursuant to these terms might be a material one; however, the quote letter is not this complete. The letter does not name Gulf Gate Lodge as the party to be insured, nor does it state when the policy would go into effect and when it would end. Without these essential terms, the quote letter is not the equivalent of an insurance contract and could not take the place of a written policy even if Giovine had received McCarron's memorandum.
Gulf Gate argues that the issue of whether McCarron's memorandum was sent and received is nevertheless material because receipt of the memorandum would indicate that either Giovine or Norwood Agency was *Page 659 
negligent in failing to take the necessary steps to procure insurance from St. Paul. Gulf Gate points out that an insurer may be bound to provide coverage when its agent has acted negligently in failing to procure it, Standard Plan, Inc. v.Tucker, 582 So.2d 1024 (Ala. 1991). It argues that both McCarron and Giovine were agents of St. Paul and that St. Paul can thus be held liable for their negligence, regardless of which one of them committed it.
The parties agree that McCarron acted as an agent for Norwood Agency; thus, if he failed to send the memorandum to bind coverage and thereafter collected premiums for the policy he failed to procure, Norwood Agency could be found to have been negligent. Norwood Agency's alleged negligence, however, could be imputed to St. Paul only if it was acting as an agent for St. Paul in this transaction. Usually, an independent broker, such as Norwood Agency, acts as an agent for the insured; in the usual case, then, if the broker negligently fails to procure insurance, the insured may sue the broker either for breach of contract or in tort for breach of a duty imposed on the agent or broker to use reasonable care, skill, and diligence in obtaining insurance. Washington National Ins. Co.v. Strickland, 491 So.2d 872 (Ala. 1985).[1] Under certain circumstances, however, an independent broker may act as an agent for both the insured and the insurer. Strickland. An insurer's liability for the fraud of an independent agent or broker is predicated solely upon actual or apparent authority conferred upon the agent/broker by the insurer to make representations on the insurer's behalf; however, an independent agent or broker can never impose liability upon the agent or broker's principal for representations that are not authorized by the principal. Strickland. An agent's apparent authority must be based on the conduct of the principal and not on the conduct of the agent, Gray v. Great America Reserve Ins.Co., 495 So.2d 602 (Ala. 1986).
It is undisputed that there was no contact between Norwood Agency and St. Paul as to Gulf Gate's liquor liability policy; in the financing agreement between Norwood Agency and the Bodes to secure coverage, Norwood Agency specifically states that it "assumes no liability hereunder as an insurer." Gulf Gate nevertheless contends that Norwood Agency had an agency relationship with St. Paul through Roehrig. Gulf Gate reasons that Roehrig is an agent for St. Paul and that, because Roehrig retains some control over Norwood Agency's actions under the producer agreement between them, Norwood Agency is therefore a subagent of St. Paul through Roehrig.
The record does not support this tenuous argument. Roehrig is not a general agent for St. Paul; rather, it is an independent broker whose only connection with St. Paul is through the specific terms of the broker agreement between them. Under that broker agreement, Roehrig may act only as a soliciting agent for St. Paul. Although Giovine has the specific authorization by letter to bind coverage for St. Paul, she cannot assign or delegate this authority to any other entity or individual, even her employer.
Even if Roehrig could be deemed an agent of St. Paul, this agency would not be extended to Norwood Agency through the producer agreement. The producer agreement establishes an arm's-length business relationship whereby Roehrig, as an agent for St. Paul, may solicit Norwood Agency, acting as the insured's agent, to provide insurance coverage from surplus line insurers through agreed-upon credit terms. The producer agreement between Norwood Agency and Roehrig is completely unrelated to the broker agreement between Roehrig and St. Paul. There is simply no evidence that St. Paul in any way acted as Norwood Agency's principal in this matter or otherwise; thus, McCarron's alleged negligence in failing to reply to Giovine's quote letter could not be imputed to St. Paul.
Gulf Gate next argues that Giovine was St. Paul's agent and that, if the finder of fact determined that she received McCarron's memorandum and did not act upon it, her "negligence" could be imputed to St. Paul. We agree that Giovine acted as St. Paul's agent under the letter of authority St. *Page 660 
Paul issued to her. We must point out, however, that even if the finder of fact determined that Giovine received the memorandum and failed to act on it, that failure would not constitute negligence that could be imputed to St. Paul. Giovine's quote letter was not an insurance contract. The letter merely described the coverage that would be availableif the Bodes qualified for it and if they complied with the "conditions to bind," including the condition that required the Bodes to pay the net premium on the policy before coverage was bound.
Gulf Gate admits that it did not meet the net premium requirement, but argues that this condition was ambiguous because it "conflicts" with the producer agreement between Roehrig and Norwood Agency. The producer agreement allows Norwood Agency 10 additional days to remit premiums after the statement date; thus, the Bodes conclude, Giovine could have bound coverage even if she did not receive the net premium payment at the same time she received McCarron's memorandum, as long as she received it within 10 days thereafter. Gulf Gate also argues that Giovine had issued binders to other clients before receiving payment.
We find these arguments meritless. The producer agreement between Norwood Agency and Roehrig specifically provides that the 10-day grace period would be superseded by "any special credit terms . . . contained in a quote letter." Thus, the terms of the letter specifically quoting the terms of providing coverage for Gulf Gate, and not the general terms of the producer agreement between Roehrig and Norwood Agency, were applicable to Gulf Gate. Moreover, Giovine was authorized to individualize the conditions of each potential binder she issued; thus, any evidence of differing conditions in quote letters to other clients is irrelevant.
Gulf Gate next argues that it actually met the net premium due condition by paying the net premium to Norwood Agency. The Bodes rely on Ala. Code 1975, § 27-10-28, which provides:
 "Liability of insurer as to losses and unearned premiums.
 "(a) As to a surplus line risk which has been assumed by an unauthorized insurer pursuant to this surplus line insurance law and if the premium thereon has been received by the surplus line broker who placed such insurance, in all questions thereafter arising under the coverage as between the insurer and the insured, the insurer shall be deemed to have received the premium due to it for such coverage and the insurer shall be liable to the insured as to losses covered by such insurance and for unearned premiums which may become payable to the insured upon cancellation of such insurance, whether or not in fact the broker is indebted to the insurer with respect to such insurance or for any other cause.
 "(b) Each unauthorized insurer assuming a surplus line direct risk under this surplus line insurance law shall be deemed thereby to have subjected itself to the terms of this section."
(Emphasis added.) Under this statute, St. Paul, as the surplus line insurer, could be bound to provide coverage to Gulf Gate even if it never received the insurance premium, butonly if it first accepted Gulf Gate as a surplus line risk andonly if Roehrig, as the broker that would have placed the insurance, received the premium. These conditions were not met; thus, § 27-10-28 is inapplicable.
The question of fact as to whether Giovine received McCarron's memorandum in response to her quote letter is simply not material, because, regardless of how it might be resolved, St. Paul does not owe a duty to defend and indemnify Gulf Gate in the underlying wrongful death action. Even if McCarron negligently failed to send it, his negligence cannot be imputed to St. Paul, because there is no agency relationship between them. Even if Giovine received the memorandum, she had no duty to bind coverage for St. Paul, because the memorandum alone was not sufficient to constitute an insurance policy or to comply with the conditions set out in her quote letter. We must therefore conclude that this issue of immaterial fact does not preclude the summary judgment in this case. *Page 661 
The summary judgment is affirmed.
AFFIRMED.
HORNSBY, C.J., and MADDOX, SHORES and INGRAM, JJ., concur.
[1] Gulf Gate has negligence and breach of contract claims against Norwood Agency pending before the trial court.