886 So.2d 773 (2004)
MOBILE AIRPORT AUTHORITY
v.
HealthSTRATEGIES, INC., et al.
1020376.
Supreme Court of Alabama.
February 6, 2004.
*774 Douglas L. Brown and Mary Carol Ladd of Armbrecht Jackson LLP, Mobile, for appellant.
Thomas A. Kendrick and James L. Pattillo of Norman, Wood, Kendrick & Turner, Birmingham, for appellee HealthSTRATEGIES, Inc.
E.L. McCafferty and C. Richard Wilkins of Vickers, Riis, Murray & Curran, L.L.C., Mobile, for appellee Pan American Life Insurance Company.
W. Austin Mulherin III and Mary Margaret Bailey of Frazer, Greene, Upchurch & Baker, L.L.C., Mobile, for appellee Sympson & Associates, Inc.

On Application for Rehearing
PER CURIAM.
This Court's opinion of October 3, 2003, is withdrawn, and the following opinion is substituted therefor.
The Mobile Airport Authority ("MAA") appeals from a summary judgment entered by the Mobile Circuit Court in favor of HealthSTRATEGIES, Inc., Sympson & Associates, Inc. ("SAI"), and Pan American Life Insurance Company ("PALIC") (hereinafter referred to collectively as "the appellees"). We affirm.
*775 This lawsuit arises out of an attempt by MAA to obtain stop-loss insurance. MAA offers health-insurance coverage to its employees and certain dependents of its employees through its self-funded employee health-insurance plan. MAA bears all of the risks and financial obligations associated with funding benefits under its health-insurance plan. MAA sought to acquire a stop-loss insurance policy to limit its financial exposure under its health-insurance plan. Stop-loss insurance "protects a self-insured employer from catastrophic losses or unusually large health costs of covered employees." Black's Law Dictionary 807 (7th ed.1999).
MAA directed HealthSTRATEGIES, its third-party administrator ("TPA"), to obtain stop-loss insurance for it. HealthSTRATEGIES chose a product offered by PALIC. PALIC did not provide stop-loss policies directly to those entities seeking such insurance. Instead, its stop-loss policies were issued by managing general underwriters, who were directly authorized to issue such policies. The particular managing general underwriter that dealt with HealthSTRATEGIES in procuring stop-loss insurance for MAA was SAI. PALIC provided SAI with the forms necessary to issue its insurance policies, including applications for stop-loss insurance policies. Therefore, HealthSTRATEGIES, later replaced as TPA by Bluebonnet Administrators of Jackson, Mississippi ("Bluebonnet"), acted as agent for MAA, and SAI acted as agent for the insurer, PALIC.
On July 1, 1998, HealthSTRATEGIES sent an application to MAA for a PALIC stop-loss insurance policy. The blanks on the application, which was drafted by PALIC, had been completed by Anthony Allen of HealthSTRATEGIES. MAA's representative signed the application, entitled "Application to Pan American Life Insurance Company for Aggregate and Specific Excess Loss Insurance" ("the application"), and submitted it to PALIC.
The trial court entered a summary judgment for the appellees and denied MAA's motion for a partial summary judgment. Its explanation of the relevant facts follows:
"On or about July 1, 1998, the MAA submitted an application to SAI for excess risk coverage underwritten by PALIC. (Deposition of Anthony W. Allen, Ex. 4.) This application set forth, among other things, the rate of premium, the duration of the policy, the nature of the risk insured and the amount of insurance. According to SAI's premium bordereau,[[1]] a policy number PAL 6901, was assigned to the MAA. (Affidavit of Mark Beize.) Thereafter, SAI sent a letter dated September 18, 1998 to Anthony Allen of HealthSTRATEGIES, which set forth all of the terms of the insurance contract; i.e., the rate of premium, the duration of the policy, the nature of the risk insured and the amount of insurance. This letter contained the following language:
"`Please review this information carefully and notify us immediately if it does not agree with your understanding of the coverage.' (Emphasis Added.)
"(Allen depo. Ex 7.) In this letter, SAI also requested a copy of the executed `Plan Document,' a Medical Disclosure Statement and a Sold Census so that the policy could be issued. (Id.)

*776 "It is undisputed that during the coverage period, i.e., July 1, 1998 to June 30, 1999, MAA's premium checks were received by its TPA and negotiated, with the amount of the premium ultimately being received and accepted by PALIC. No such payments were ever returned. It is likewise undisputed that at no time was MAA ever denied coverage for an excess risk claim. In fact, at the one and only time a claim for stop loss benefits was presented, MAA was asked only to submit the Plan Document and Disclosure Statement so such claim could be processed. (Deposition of Janet McCurley depo. pp. 35-37.)
"In December, 1998, the MAA changed TPAs and engaged Bluebonnet Administrators of Jackson, Mississippi to serve in such capacity. (McCurley depo. p. 22.) In a letter to Harold Adcock of Bluebonnet dated February 26, 1999, SAI advised Bluebonnet that `the policy for [MAA] cannot be issued because the following documentation remains outstanding: A) a copy of the signed Plan Document; and B) a completed disclosure statement.' (Beize depo., Ex. 16.) In this letter, Mr. Beize also states `... I agreed to entertain the idea of changing administrators mid-contract...' (Emphasis Added.) This letter goes on to state `... unless complete and satisfactory information is received in this office within ten (10) days of the date of this letter, we will have no choice but to send written notice of cancellation to the client.' (Emphasis Added.)(Id.)
"On May 7, 1999, SAI again contacted Harold Adcock of Bluebonnet again requesting the executed Plan Document (Beize depo., Ex. 18.) This same request for an executed Plan Document was reiterated to Bluebonnet on June 9, 1999, July 8, 1999, and August 5, 1999, and then directly to the MAA for the first time on August 5, 1999. (Beize depo., Ex. 18, 19, 20.) Bluebonnet never provided SAI with the signed Plan Document or disclosure statement. Consequently, no written policy was ever delivered to the MAA. Nevertheless, it is undisputed that at no time was coverage ever terminated, denied or otherwise characterized as being `nonexistent.'
"At some point, the MAA submitted a stop-loss claim to SAI in connection with a claim paid by the MAA for a Mattie Westbrook. (Bieze depo. Ex. 2.) On October 7, 1999, SAI wrote Ida Craig of Bluebonnet acknowledging receipt of the claim. Again, Bluebonnet was asked to provide SAI with a signed Plan Document and disclosure statement so the policy could be issued and the claim processed. Nowhere in this letter is there any indication that no coverage existed. (Beize depo. Ex. 15.)
"On October 7, 1999, SAI sent another fax directly to Janet McCurley of the MAA referencing the Westbrook claim and stating that such claim remained pending until the excess policy was issued. (McCurley depo. Ex. 1.) Again, SAI advised MAA that the policy could not be issued until SAI was provided with a signed Plan Document and disclosure statement. No Plan Document or disclosure statement was ever provided to SAI by either the MAA or its TPA.
"On August 31, 2000, counsel for the MAA sent a letter to HealthSTRATEGIES, SAI and PALIC inquiring as to the disposition of the premiums tendered by the MAA for excess risk coverage. (Beize depo. Ex. 21.) By letter dated September 21, 2000, Mark Beize of SAI responded to said inquiry confirming that `excess insurance was in place for [the MAA] for the period July 1, 1998 through June 30, 1999.' This letter further advised that no claim had *777 ever been denied under such coverage, but the Mattie Westbrook claim remained pending until the executed Plan Document was received. Mr. Beize likewise advised that SAI was prepared to process and pay any eligible claim as soon as the executed Plan Document was received. (Beize depo. Ex. 23.) On October 18, 2000, Lori Levy of PALIC wrote counsel for the MAA reiterating SAI's request for the executed Plan Document so the claim could be processed. (PALIC Response to Request for Production.)
"The `threshold' issue presented to the Court is whether the MAA had stop-loss coverage during the relevant period. All parties concur that there are no genuine issues of material fact relative to such `threshold' issue and that a determination thereof may be made by the Court as a matter of law.
"The entirety of the MAA's claims is premised on the absence of such coverage. MAA argues that there was no acceptance of the MAA's application for stop-loss insurance. However, the undisputed evidence is to the contrary. As pointed out above:
"1. The SAI premium bordereaux attached to the affidavit of Mark Beize reflects that policy number PAL 6901 was assigned to the MAA. (Affidavit of Mark Beize.)
"2. The September 18, 1998 letter from Sympson & Associates (`SAI') to Anthony Allen of HealthSTRATEGIES, sets forth all of the terms of the insurance contract; i.e., the rate of premium, the duration of the policy, the nature of the risk insured and the amount of insurance. This letter goes on to state as follows:
"`Please review this information carefully and notify us immediately if it does not agree with your understanding of the coverage.' (Emphasis Added.)
"(Allen Depo., Ex 7.)
"3. The February 26, 1999 letter from Mark Beize to Harold Adcock, of Bluebonnet Administrators states `... I agreed to entertain the idea of changing administrators mid-contract...' (Emphasis Added.) This letter goes on to state `... unless complete and satisfactory information is received in this office within ten (10) days of the date of this letter, we will have no choice but to send written notice of cancellation to the client.'(Emphasis Added.)
"4. Bluebonnet Administrators continued to remit premiums and collect commissions on those premiums, even after being apprized [sic] of the fact that no written policy had been issued. Harold Adcock of Bluebonnet testified that even after being informed that no policy was issued he had no reason to believe that there was no stop-loss coverage in place for the MAA. (Deposition of Harold Adcock p. 11.) Additionally, Mr. Adcock testified `The coverage was in effect and if a claim was filed under the coverage it should have been paid.' (Id., p. 16.)
"5. Upon receipt of a claim under the stop-loss policy, SAI continued to ask for the signed Plan Document and Medical Disclosure Statement, and at no time was the MAA ever informed that a claim was not covered as a result of the MAA's failure to provide the requested information.
"All of the foregoing reflect contemporaneous affirmations of the existence of stop-loss coverage. Indeed, the totality of the circumstances reflects that all parties believed that there was stop-loss coverage, and that they all acted in conformity *778 with such belief. Consequently, there is no evidence, much less substantial evidence, to establish that PALIC had not accepted the risk."
Janet McCurley, MAA's benefits personnel coordinator, testified by deposition: "I paid the premiums. I thought I had a policy."
On June 28, 2001, MAA sued HealthSTRATEGIES, SAI, and PALIC in the Mobile Circuit Court. Including the claims alleged in MAA's second amended complaint filed on June 22, 2002, MAA alleges equitable claims of unjust enrichment, money had and received, and quasi-contract against all the appellees; various tort claims against all the appellees; and a breach-of-contract claim against HealthSTRATEGIES. On May 31, 2002, PALIC and SAI filed motions for a summary judgment; HealthSTRATEGIES did the same on June 14, 2002. On September 30, 2002, MAA filed a motion for a partial summary judgment against all the appellees with respect to its equitable claims. On October 17, 2002, the trial court granted the appellees' motions for a summary judgment and denied MAA's motion for a partial summary judgment. MAA appeals.
MAA argues that evidence was presented indicating that MAA never had the stop-loss insurance coverage issued by PALIC because no written policy was issued and, it argues, there was therefore no agreement between the parties. MAA also argues that the doctrine of waiver  i.e., that the appellees waived certain conditions precedent  cannot apply in this case. MAA's argument as to coverage is misplaced. The fact that there was no written policy is undisputed. The question before the trial court was whether there were sufficient acts on the part of the appellees to constitute acceptance of MAA's offer. The acts of the parties can override the language of an application. See Ex parte Ikner, 682 So.2d 8 (Ala.1996); Howard v. Mutual Sav. Life Ins. Co., 650 So.2d 868 (Ala.1994); Henson v. Celtic Life Ins. Co., 621 So.2d 1268 (Ala.1993); and Washington Nat'l Ins. Co. v. Scott, 231 Ala. 131, 164 So. 303 (1935). We discuss these cases below.
MAA points out that the second line of the application it signed states: "This Application must be accepted and approved by [PALIC] or its authorized representative prior to any Contract being in existence." The following appears on page three of the application:
"11. IT IS UNDERSTOOD AND AGREED, AS CONDITIONS PRECEDENT TO THE APPROVAL OF THIS APPLICATION THAT:
"....
"(b) All documentation requested by the Company must be submitted prior to any approval of this Application and must be received by the Company within ninety (90) days of the requested Effective Date.
"....
"(f) Receipt of a premium and its deposit in connection with the Application shall not constitute an acceptance of liability....
"....
"(k) NEITHER THIS APPLICATION NOR THE TERMS OF THIS APPLICATION MAY BE ALTERED."
(Capitalization original.) On the last page of the application is a blank for the signature of the applicant and a blank for a signature labeled "Acceptance by Carrier." No signature appears in the latter blank. MAA asserts other facts about the documents necessary for the issuance of the policy and PALIC's need for those documents before it could issue the policy. MAA's argument based on those facts is not helpful, however, because a contract *779 can exist, even without a written document, based on the parties' express acts.
Our review of a summary judgment is de novo. American Liberty Insurance Co. v. AmSouth Bank, 825 So.2d 786, 790 (Ala.2002). In Hobson v. American Cast Iron Pipe Co., 690 So.2d 341, 344 (Ala.1997), this Court stated its standard for reviewing a summary judgment:
"In reviewing the disposition of a motion for summary judgment, `we utilize the same standard as the trial court in determining whether the evidence before [it] made out a genuine issue of material fact,' Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala.1988), and whether the movant was `entitled to judgment as a matter of law.' Wright v. Wright, 654 So.2d 542 (Ala.1995); Rule 56(c), Ala. R. Civ. P. When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989). Evidence is `substantial' if it is of `such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' Wright, 654 So.2d at 543 (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989)). Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Wilma Corp. v. Fleming Foods of Alabama, Inc., 613 So.2d 359 (Ala.1993); Hanners v. Balfour Guthrie, Inc., 564 So.2d 412, 413 (Ala.1990)."
Furthermore, "`[l]egal conclusions are never accorded a presumption of correctness on appellate review.'" Auburn Univ. v. Advertiser Co., 867 So.2d 293, 299 (Ala.2003) (quoting Ex parte Cain, 838 So.2d 1020, 1026 (Ala.2002)).
The main dispute at issue in this appeal is whether MAA had stop-loss insurance in effect during the period it was paying premiums. MAA argues that no coverage existed during that period because, it argues, its application for stop-loss insurance had not been accepted or approved. Moreover, it argues that there was no oral contract of insurance because, its says, the parties never agreed on the "essential terms" of the contract and there was no acceptance.
An insurance contract, like all other contracts, requires an offer, acceptance of that offer, consideration, and mutual assent to terms essential to the formation of the contract. See Southern Energy Homes, Inc. v. Hennis, 776 So.2d 105, 108 (Ala.2000). The existence of a contract is determined by reference to "`the reasonable meaning of the parties' external and objective manifestations of mutual assent, rather than by their uncommunicated beliefs.'" Holland v. Continental Tel. Co. of the South, 492 So.2d 998, 1000 (Ala.1986) (quoting Mayo v. Andress, 373 So.2d 620, 623-24 (Ala.1979)). An application for insurance is merely an offer on the part of the applicant to purchase insurance. McGhee v. Paramount Life Ins. Co., 385 So.2d 969, 971 (Ala.1980). "`The acceptance [of such an offer] must be signified by some act or acts agreed upon by the parties, or from which the law raises the presumption of acceptance.'" McGhee, 385 So.2d at 971 (quoting Cherokee Life Ins. Co. v. Brannum, 203 Ala. 145, 148, 82 So. 175, 178 (1919)).
MAA relies upon Gray v. Great American Reserve Insurance Co., 495 So.2d 602 (Ala.1986), to support its argument. In Gray, the Court, quoting Gillilan v. Federated Guaranty Life Insurance Co., 447 *780 So.2d 668, 671-72 (Ala.1984), stated that "`an application for insurance is a mere offer which does not ripen into a contract unless, and until, it is accepted by the insurer.'" 495 So.2d at 605. In that case, a couple submitted an insurance application with a premium payment and, based on a misrepresentation made by the salesperson, believed they were instantly covered under the policy. 495 So.2d at 603. However, the application stated that the insurance was not in force until the first premium was paid and a "certificate" was issued. 495 So.2d at 605. No "certificate" was ever issued. The Court held that, under the express terms of the application, no acceptance of the application had occurred. 495 So.2d at 605. The insurance agent in Gray was not an agent for the insurance company at the time he sold the plaintiffs the insurance. Also, the Markman Agency, where the plaintiffs' application was sent, and which marketed insurance for the North American Consumer Alliance outside the State of Texas, sent the application back to the agent for him to obtain from the plaintiffs North American Consumer Alliance dues. In Gray, a statement in the application stated that Great American would issue a "certificate" once it had completed an investigation of the applicants for insurance. In addition, in Gray the plaintiffs alleged that the agent told them that once they paid the first premium, they would be covered. The plaintiffs had paid only one premium when they filed a claim. Because no certificate had been issued, this Court held that the plaintiffs had never had insurance coverage.
The facts of Gray are distinguishable from those here. In Gray, after receiving the insurance application and one premium payment, the insurance company required the agent to apply for agent status with its company and returned the plaintiffs' application, demanding that they pay North American Consumer Alliance dues. Unlike the relationship that had developed over time between the parties in this case, there were no acts of waiver on the part of Great American to indicate an acceptance of the application.
MAA argues that the application MAA signed requires that it "be accepted and approved by the Company or its authorized representative prior to any Contract being in existence." MAA claims that the fact that the application remains unsigned by either PALIC or SAI is evidence on the face of the application that it was not accepted by either PALIC or SAI. But such explicit acceptance is not necessary because the actions of the parties evidence acceptance. In addition, the application contained adequate information as to the terms of the insurance coverage to let MAA know what the policy covered.
MAA argues that the following statement in the "Conditions Precedent" section is critical to a determination that it did not have coverage:
"Receipt of a premium and its deposit in connection with the Application shall not constitute an acceptance of liability. In the event that [PALIC] disapproves this Application, its sole obligation shall be to refund such sum to the Applicant."
That statement would be dispositive but for several important considerations. PALIC never disapproved MAA's application. Also, the context of the statement limits the effect of this condition. The statement above indicates that PALIC always has the option of rejecting an applicant if adequate reasons for that rejection exist. If, for example, the application contains false information, PALIC would obviously not have to accept liability just because premiums had been paid.
The trial court determined that an oral contract existed between the *781 appellees and MAA. An oral contract for insurance may exist, so long as the "essential terms" of the contract are agreed upon. Powell v. State Farm Mut. Auto. Ins. Co., 601 So.2d 60, 62 (Ala.1992); see also Gulf Gate Mgmt. Corp. v. St. Paul Surplus Lines Ins. Co., 646 So.2d 654, 658 (Ala.1994). The "essential terms" of an insurance contract are (1) the rate of premium, (2) the duration of the policy, (3) the nature of the risk, (4) a description of the property or person or interest to be insured and its location, and (5) the amount of insurance. 646 So.2d at 658. The appellees assert that all of those essential elements were contained in the application[2] and in a September 18, 1998, letter sent by SAI to HealthSTRATEGIES.[3] Acceptance of MAA's application for stop-loss insurance was clear from PALIC's receipt of premiums; from the assignment of a policy number to MAA; and from the letters sent from SAI to HealthSTRATEGIES, which used terms such as "coverage," "mid-contract," and "cancellation" when describing the relationship with MAA.
One of the documents requested in the September 18, 1998, letter was a medical-disclosure statement. MAA never filed the medical-disclosure statement. MAA argues that the medical-disclosure statement is an "essential element" of the oral contract because according to the medical-disclosure statement form, it is "an underwriting consideration material to the acceptance of the risk." It further argues that because it never submitted the medical-disclosure statement, there was no contract. However, PALIC accepted the risk if it manifested that acceptance by clear and unambiguous acts. In this case, PALIC's acceptance of premium payments for more than a year and its decision not to cancel the insurance coverage in spite of *782 the failure of MAA to submit the medical-disclosure statement shows that PALIC had, in fact, accepted the risk. If upon receiving the medical-disclosure statement from MAA, PALIC had denied the claim filed in October 1999, then MAA could use the application and the September 18, 1998, letter to appeal PALIC's decision not to pay the claim. It could also argue that PALIC, by its decision not to cancel MAA's coverage, had waived its opportunity to deny such a claim, if, in fact, PALIC was to contemplate such a denial.[4] In any event, PALIC did not deny a claim made by MAA; therefore, that issue is not before us. The actions of PALIC and SAI evidenced acceptance and also a waiver of the statement in the "Conditions Precedent" portion of the application that receipt of a premium does not constitute acceptance of liability. We cannot say that the trial court erred in so ruling.
In addition to arguing in its brief to this Court that no coverage ever existed, MAA argues that "waiver or estoppel cannot create insurance coverage where none exists. In other words, the application of the waiver doctrine can only preclude the insurer from invoking exclusions to an existing insurance policy, but cannot be invoked to create insurance coverage." (Emphasis original.) (MAA's brief, p. 17.) In support of that argument, it relies on such cases as McGee v. Guardian Life Insurance Co., 472 So.2d 993 (Ala.1985), and Home Indemnity Co. v. Reed Equipment Co., 381 So.2d 45 (Ala.1980). However, those cases dealt with attempts to create liability for events and persons specifically excluded from coverage by the insurance policy itself. The appellees in this case are not creating nonexistent coverage for MAA; they, in fact, acted to ensure that the MAA was adequately covered at all times.
This Court has explained the doctrine of waiver as follows:
"Waiver ... has been defined as the `voluntary and intentional surrender or relinquishment of a known right.' Dominex, Inc. v. Key, 456 So.2d 1047, 1058 (Ala.1984); see, also, City of Montgomery v. Weldon, 280 Ala. 463, 195 So.2d 110 (1967). An intention to waive a right may be found where one's course of conduct indicates such an intention or is inconsistent with any other intention. Braswell Wood Co. v. Fussell, 474 So.2d 67 (Ala.1985); see, also, 28 Am.Jur.2d Estoppel and Waiver, §§ 158, 160 (1966)."
Ford v. Jackson Square, Ltd., 548 So.2d 1007, 1013 (Ala.1989).
In Home Indemnity, this Court stated:
"[C]overage under an insurance policy cannot be created or enlarged by waiver or estoppel and, if there is no ambiguity, it is the duty of the court to enforce the policy as written. Aetna Ins. Co. v. Pete Wilson Roofing & Heat. Co., Inc., 289 Ala. 719, 272 So.2d 232 (1972). Here, the policy provision in question pertains to coverage rather than forfeiture. It follows that it could not have been waived by Appellant; and, if the provision is without ambiguity, it is due to be given effect."
381 So.2d at 51 (emphasis added). Again, MAA's argument is misplaced: the question here is not whether a written policy was issued. It is undisputed that a written insurance policy was never issued. The question is whether the necessary documents, in particular the medical-disclosure statement, are subject to waiver. If the *783 provision in the application requiring the submission of the medical-disclosure statement is a provision related to coverage, it may not be waived.
MAA argues that "in the obverse scenario, MAA could only argue the waiver doctrine in an effort to `create' a contract of insurance, an argument that is plainly unavailable under Alabama law." (MAA's brief, p. 20.) However, this argument denies the possibility of coverage based on the objective actions of the parties. MAA continues: "Indeed, none of the waiver or estoppel cases cited by [the appellees] involves a situation where there was no insurance policy." In Henson, supra, this Court stated:
"Another major difference between McGee [v. Guardian Life Insurance Co., 472 So.2d 993 (Ala.1985),] and the present case is that the employment requirement in McGee was set forth in the policy itself, while here the requirement was embodied, to whatever extent, in an application for insurance. While it appears that this Court has never decided a case directly on point, it is clear that terms and conditions in an insurance application  even conditions precedent to the commencement of the contract  may be waived by the insurer. See 16B John Appleman, Insurance Law and Practice, § 9083 (1981); 44 C.J.S. Insurance § 275(a)(2) (1945)....
"Moreover, it is settled that acceptance of premiums by an insurer, after learning of a breach of a condition or ground for forfeiture, normally constitutes a waiver or estoppel. General Insurance Co. v. Killen, 270 Ala. 604, 120 So.2d 887 (1960)."
621 So.2d at 1277. In other words, the presence of a "condition precedent" in the insurance application and noncompliance with that condition by one of the parties does not alone mean that the provision pertains to coverage and cannot be waived. We cannot allow MAA to escape and even obtain a refund of its obligation under an agreement  a return of its premiums  in this situation, and we would not allow an insurance company to escape its coverage liability in the converse situation.
MAA's argument that none of the cases cited by the appellees involved a situation where no policy existed is incorrect. The policy in Henson was not issued until six months after the plaintiff had filed a claim. Other cases support the proposition that waiver will apply when the explicit acts of the parties are contrary to the application. In Ikner, supra, the insured's insurance had been "terminated" by certain provisions in the policy. However, unaware of those provisions and the purported termination, he continued paying premiums from December 1988 until January 1993. This Court held that the insurance company was estopped from applying the provisions to Ikner's policy.
"Blue Cross did not misrepresent the fact that Ikner had insurance, because that fact was true. Blue Cross did not suppress (or fail to inform Ikner of) the fact that he had no coverage, because he did have coverage. It is well settled under Alabama law that when an insurer has knowledge of a fact or situation that it could use to invoke a provision of its policy that would render the policy void and worthless, but nonetheless continues to accept premium payments from its insured, it will be considered to have waived that provision and will be estopped from using that provision to deny a claim."
682 So.2d at 10. In this case, even if, as MAA argues, the submission by the insured of the medical-disclosure statement is a condition precedent so that failure to submit it "would render the policy void *784 and worthless," PALIC and SAI waived the option of denying a claim on that basis.
In Howard, supra, this Court stated:
"Assuming that the `other insurance' clause could have rendered the later policy void and worthless, we must conclude that Mutual Savings waived the enforcement of `other insurance' clauses by accepting premiums over a 12-year period. In view of the waiver, Mutual Savings was obligated to pay when claims were made on the policy, not to return the premiums. This is exactly what Mutual Savings did."
650 So.2d at 870. In that case, a specific provision in the policy stated a condition under which the insurance company would return the premiums to the insured. Yet, this Court stated that payment of the entire claim, not the return of the premiums, was proper for the insurer, which had waived the condition by accepting premiums from the insured.
In Scott, supra, this Court stated:
"Probably there is no principle of insurance law more firmly settled, nor better grounded in justice and reason, than that an insurer, who receives and retains premiums, the very consideration for carrying the insurance risk, with knowledge of facts which, under stipulations for his benefit, would, in the absence of such knowledge, empower him to treat the policy as having never been in force, will be held to have waived such stipulations. Waiver, strictly speaking, is a matter of intent. But, in such case, no proof of actual intent is required. Any other intent, in such case, would work a positive wrong or fraud on the insured. The law charges the insurer with intent to waive under the doctrine of estoppel."
231 Ala. at 132, 164 So. at 304 (emphasis added).
May PALIC here treat the policy "as having never been in force" after receiving MAA's premiums for over a year? Clearly not. The trial court correctly determined that the application and the September 18, 1998, letter contained the essential elements for binding PALIC and SAI; therefore, there is no reason to consider the medical-disclosure statement critical to the issue whether PALIC and SAI had accepted MAA's application for insurance.
If MAA filed a claim for an event not covered by the terms in the application and the September 18, 1998, letter from SAI, clearly that attempt to create coverage when there was none would not justify waiver. However, if MAA filed a claim that was covered by the stop-loss insurance, as delineated by the application and the September 18, 1998, letter, then under the principles stated in our cases, PALIC could not argue that its acceptance of premiums did not equate to acceptance of the terms of MAA's offer. Also, if a forfeiture event, as determined by the medical-disclosure statement, occurred, indicating that MAA was not eligible for coverage by PALIC, and PALIC continued to accept premiums from MAA, PALIC would again find it difficult to overcome the waiver argument.
In order to overcome the evidence of waiver of the condition presented by the appellees in their summary-judgment motions, MAA would have had to present more than just language from the application. The trial court had more than enough evidence of coverage, or at least of waiver of the condition precedent, which is the very language relied upon by MAA to oppose the summary-judgment motions. MAA should have provided evidence of acts by the appellees indicating an intent contrary to providing coverage, e.g., denial of a claim, which it did not.
There are important policy reasons for not allowing MAA to renege on its agreement *785 with the appellees. Did the lack of the medical-disclosure statement mean that not all of the essential elements of an oral contract were present? SAI continually requested that document in its communications with MAA. MAA itself learned what documents were needed when it received direct communication from SAI in a telefaxed document on August 5, 1999. At that point, MAA had had control of the contracting process, through its TPA, for over a year. In other words, the reason no written policy had ever been issued was solely because MAA had not responded to SAI's request for the medical-disclosure statement. MAA may not drag its feet in complying with the requests of the insurance company, which had accepted liability and to which MAA was voluntarily paying premiums, and then demand the return of its premiums, arguing there had not been an acceptance by the insurance company.
PALIC lacked the necessary documents for processing a claim because of MAA's own lack of action. PALIC and SAI did nothing to hinder MAA from providing the necessary paperwork. In fact, PALIC and SAI showed remarkable patience by sending several requests over the period of a year. Yet at no time did PALIC or SAI cancel MAA's coverage. In other words, MAA cannot, by its own neglect, delay the process of obtaining an insurance policy, then sue the insurance company, complaining that no policy has been issued and demanding the return of the premiums it has paid.
Further, we cannot allow an insurer to immunize itself from the effect of its own actions of waiver and that of its insured by placing a sentence in an insurance application. If two parties engage in actions for more than a year that express an intent to be bound contractually, and if the insured has enough information to understand the essentials of coverage, as MAA had from the application and the September 8, 1998, letter, and no event has occurred triggering forfeiture, we cannot allow the wording of one sentence in the application to override the entire relationship the parties have developed. Here the insured is trying to take advantage of the statement to get a refund of premiums. The next time the insurer may seek to avoid liability for a claim it would rather not pay. Contextually, the statement has to do with a forfeiture situation, and because no forfeiture situation has arisen between MAA and PALIC, we refuse to expand the statement to mean what MAA argues it should mean. Nor can we allow MAA to argue that that one sentence trumps the actions of both parties in this case, actions that evidence the existence of coverage for MAA. As the trial judge determined, PALIC and SAI have waived any requirement that the medical-disclosure statement be filed as a condition of coverage. Neither they nor MAA may now renege on the agreement their actions objectively manifest.
If we allow an insurance company to accept premiums for an applicant but not issue a policy because the applicant has not submitted certain "necessary" documents, and then deny the applicant coverage, what would stop the insurance company from arguing, in a case that would benefit itself and harm the insured, that it had not waived the requirement for those documents? Such a result would undermine our precedent regarding waiver and could easily prejudice other insureds who want to keep their insurance and file claims with their insurance company, even if they have not completely complied with all the requirements in the insurance application.
MAA had control of the contracting process in this case. Its agent, the TPA, knew for over a year that PALIC needed the documents. Once MAA itself knew that *786 certain documents were necessary to process the claim, it could have provided the documents required by PALIC, and PALIC would have issued the policy and processed the claim. In spite of anything to the contrary in the application documents, the payment of premiums and the many communications surrounding the requirement of the medical-disclosure statement and other documents are evidence of the fact that all parties knew that MAA had stop-loss insurance coverage during the period from July 1998 to June 1999. Therefore, MAA was "bound" during that period and ratified the contract by filing a claim. If MAA had filed the claim involving Mattie Westbrook and been told by PALIC that MAA was not covered by stop-loss insurance, MAA would have a claim for coverage in accordance with the facts as the parties had understood them until that point, that is, that PALIC had accepted liability for covered claims filed by MAA for stop-loss insurance.
As the trial court determined, the appellees' objective acts indicated their acceptance of MAA's application; none of their actions indicated that MAA had no stop-loss coverage. In addition, the trial court properly determined that an oral contract, instead of a written policy, existed between the parties and that the essential elements of that contract were contained in the stop-loss insurance application and the September 18, 1998, letter. Further, the actions of PALIC and SAI manifested the intent to accept MAA's application, even without the necessary documents, and acknowledged that those documents were not critical to determining whether coverage existed for MAA and that, therefore, waiver also applies to any conditions stated in the application.
MAA did not present any evidence of acts by PALIC and SAI evidencing a lack of acceptance of the application or indicating that MAA had no stop-loss insurance coverage. Therefore, MAA did not present substantial evidence in opposition to the appellees' motions for a summary judgment. We affirm the trial court's summary judgment in favor of PALIC, SAI, and HealthSTRATEGIES, and we affirm the trial court's order denying MAA's motion for a partial summary judgment.
APPLICATION GRANTED; OPINION OF OCTOBER 3, 2003, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED.
HOUSTON, SEE, BROWN, WOODALL, and STUART, JJ., concur.
LYONS, JOHNSTONE, and HARWOOD, JJ., concur in the result.
JOHNSTONE, Justice (concurring in the result).
The record contains substantial evidence that an insurance contract did not come into existence as well as substantial evidence that an insurance contract did come into existence. Indeed, the record contains more-than-substantial evidence that the "Medical Disclosure Statement," which was never forthcoming, was a condition precedent to the very making of the contract, not merely a condition precedent to the processing of a claim.
The conflicting substantial evidence creates a genuine issue of material fact  whether an insurance contract ever came into existence  which precludes summary judgment in favor of either side. Rule 56(c)(3), Ala. R. Civ. P. The plaintiff-appellant Mobile Airport Authority ("MAA"), however, did not argue before the trial court and does not argue before us that a genuine issue of material fact precluded summary judgment. Instead, MAA stipulated that there was no genuine issue of material fact and argued to the trial court *787 and argues to us that there was no substantial evidence that an insurance contract ever came into existence. This argument is simply incorrect. We cannot base a reversal of the trial court on an incorrect argument. Nor can we reverse the trial court on a ground  the existence of a genuine issue of material fact  not argued to the trial court or not argued to us. Ex parte Ryals, 773 So.2d 1011, 1013 (Ala.2000). Therefore I concur in the result of affirming the trial court.
NOTES
[1] A "bordereau" is "[a] description of reinsured risks; esp., a periodic report provided by a cedent to a treaty reinsurer, consisting of basic information affecting the reinsurance treaty, such as the underlying insureds, the types of risks covered, policies, and dates of loss." Black's Law Dictionary 178 (7th ed.1999).
[2] Part 8 of the "General Schedule Options" in the application included, among other information, the following:

The application included the following entries: "Aggregate Deductible Per Month, per single Employee: $112.11; per Family: $244.90; Composite: $208.38"; "Aggregate Payable Percentage (excess of deductible): 100%"; "Maximum Eligible Claim Expense Per Covered Person: $1,000,000"; "Annual Minimum Aggregate Deductible: $300,074"; "Maximum Aggregate Benefit (excess of Deductible): $975,000." The application stated that to qualify for benefits the expenses must be incurred from July 1998 to June 1999. It then listed the following: "Specific Eligible Expense: Medical Only $25,000"; "Specific Deductible (per person): 100%"; "Maximum Specific Benefit (per person in excess of Specific Deductible): $975,000"; "Aggregate Premium  Premium Per Month Per Unit: 4.84; Monthly Aggregate Accommodation, Premium Per Month Per Unit: $1.00"; "Specific Premium  Premium Per Month Per Single Employee: $32.50"; "Per Family: $70.29."
[3] The September 18, 1998, letter from SAI's group underwriter, Scott Leslie, stated:

"Thank you for placing the above-captioned case with us. We appreciate your business.
"The purpose of this letter is to initiate the Binder/Issue process. Attached is the sold case information for the above captioned group (rates, factors, enrollment, coverage information, etc....). Please review this information carefully and notify us immediately if it does not agree with your understanding of the coverage. After 10 working days we will assume the attached information is correct.
"SAI will require the following information in order to complete this file and issue the contract; please forward this information at your earliest convenience. It is our strong preference that this information be submitted together in it's [sic] entirety, allowing SAI to quickly and accurately issue the contracts.
"1. Plan Document signed by employeer [sic]
"2. Medical Disclosure Statement
"3. Sold Census"
This first page is followed by four pages detailing the specific aspects of the coverage.
[4] Of course, we do not mean to imply that PALIC could not raise the issue of MAA's neglect in providing the medical-disclosure statement in defense of its decision to deny a claim.